# 23-7452-cv

## United States Court of Appeals
### *for the*
### Second Circuit

---

DARREN E. THOMAS, MARLENE THOMAS,

*Plaintiffs-Appellants,*

– v. –

LEONARD GENOVA, CHRISTOPHER GIOIA,
THE TOWN OF OYSTER BAY, CHRISTINA F. NICOLIA,
as Executrix of the Estate of FREDERICK P. IPPOLITO,

*Defendants-Appellees,*

JOHN VENDITTO, FREDERICK P. IPPOLITO, JOSEPH S. SALADINO,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

HARRY H. KUTNER, JR.
THE LAW OFFICE OF
   HARRY H. KUTNER, JR.
*Attorney for Plaintiffs-Appellants*
1325 Franklin Avenue, Suite 225
Garden City, New York 11530
(516) 741-1400

CP COUNSEL PRESS   (800) 4-APPEAL • (329942)

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      TOB's position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      Collateral proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT I

      THE ORDER REVERSED RULE 56 MOTION CRITERIA . . . 22

            Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 22

            Discrimination - the Burden-Shifting Steps . . . . . . . . 24

            Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

POINT II

      APPELLEES' ATTORNEY'S CONFLICT OF INTEREST
      [SPA 50] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT III

A P-E, N-CU 2-F HOME BY DEFINITION DOES NOT HAVE
NOR NEED A C.O. OR S.U.P., CONSTITUTIONALLY
EXEMPT FROM EVEN HAVING TO APPLY THEREFOR . . . . 30

POINT IV

42 U.S.C. § 1983 CLAIMS - GENERALLY  . . . . . . . . . . . . . . . 31

Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . 31

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    A.    Genova [A. 348-51 (#s 50-54), 362-364]. . . . . . 31

    B.    Ippolito [A. 350 (#55), 364-366] . . . . . . . . . . 33

    C.    Gioia [A. 338-343 (#s 11-38), 352-62] . . . . . . . 34

A.    MALICIOUS PROSECUTION [SPA 14-17] . . . . . . . . . . 35

Standard of Review  . . . . . . . . . . . . . . . . . . . . . 35

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.    SELECTIVE ENFORCEMENT [SPA 17-22] . . . . . . . . . . 40

Standard of Review  . . . . . . . . . . . . . . . . . . . . . 40

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 40

C.    DUE PROCESS CLAIM IS RIPE [SPA 22-23] . . . . . . . . . 45

D.    SUPERVISORY LIABILITY (GENOVA, IPPOLITO) [SPA 23-27] 46

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . 46

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Genova is liable . . . . . . . . . . . . . . . . . . . . . . . . 48

Ippolito is liable . . . . . . . . . . . . . . . . . . . . . . . 50

Result . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

E.    HAVING ENGAGED IN A RACIST CONSPIRACY, GIOIA IS NOT QUALIFIEDLY IMMUNE. [SPA 30-33] . . . . . . . . . . 51

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . 51

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

POINT V

VIOLATIONS OF U.S.C. §§ 42-1981-82, 1985-86, and FHA ARE SIMILARLY MERITED. [SPA 33-39] . . . . . . . . . . . . . . . . 54

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . 54

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

POINT VI

*MONELL* LIABILITY CONFESSED BY INSIDER . . . . . . . . . . . . 57

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . 57

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

iii

POINT VII

THE STATE CLAIMS SHOULD BE REMANDED . . . . . . . . . . . . 58

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# TABLE OF AUTHORITIES

*Cases*

*Anderson v. Creighton,* 483 U.S. 635 (1987) . . . . . . . . . . . . . . . 51

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) . . . . . . . 22, 24

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . 46

*Carlton v. Mystic Transp., Inc.,* 202 F.3d 129
(2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Carroll v. United States,* 267 U.S. 132 (1925) . . . . . . . . . . . . . . . 35

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) . . . . . . . . . . . . . . . 22

*Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29
(2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir. 1976) . . 27

*City of New York v. Bilynn Realty Corp.,* 118 A.D.2d 511
(1st Dept. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Coggins v. Buonora,* 776 F.3d 108 (2d Cir. 2015) . . . . . . . . . . 51, 52

*D'Amico v. City of New York,* 132 F.3d 145 (2d Cir. 1998) . . . . . . 22

*Freedom Holdings v. Spitzer,* 357 F.3d 587 (2nd Cir. 2004) . . . . . . 40

*Gallo v. Prudential Res. Servs.,* 22 F.3d 1219
(2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Glueck v. Jonathan Logan, Inc.,* 512 F. Supp. 223
(SDNY 1981), *aff'd* 653 F.2d 746 (2d Cir. 1981) . . . . . . . . . . . . . 27

*Good v. Curtis,* 601 F.3d 393 (5th Cir. 2010) . . . . . . . . . . . . . . . 52

*Greene v. Town of Blooming Grove,* 879 F.2d 1061
(2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 45

*Harewood v. City of New York,* 508 F. App'x 60 (2d Cir. 2013) . . . 52

*Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir. 1975) . . . . . . . . . . 27

*Hunt v. Cromartie,* 526 U.S. 541 (1999) . . . . . . . . . . . . . . . . . . . 24

*Jett v. Dallas, Idep. School Dist.,* 491 U.S. 701, 733 (1989) . . . . . . 54

*Manganiello v. City of New York,* 612 F.3d 149 (2d Cir. 2010) . . . 52

*Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690-91 (1978) . . . 3, 57

*Morse v. Fusto,* 804 F.3d 538 (2d Cir. 2015) . . . . . . . . . . . . . . . 51

*Novak v. Metro Health Med. Ctr.,* 503 F.3d 572
(6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*One Barberry R.E. Holdings, Inc. v. Maturo,* 2023 U.S.
Dist. LEXIS 236738 (D. Conn. 2023) . . . . . . . . . . . . . . . . . . . 45

*Papanicolaou v. Chase,* 720 F. Supp. 1080 (S.D.N.Y. 1989) . . . . . 27

*Posr v. Court Officer Shield #207,* 180 F.3d 409
(2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Rohman v. NYCTA,* 215 F.3d 208 (2d Cir. 2000) . . . . . . . . . . 39, 51

*Silva v. Farrish,* 47 F. 4th 78 (2d Cir. 2022) . . . . . . . . . . . . . . . . 55

*Singer v. Fulton Co. Sheriff,* 63 F.3d 110 (2d Cir. 1995) . . . . . . . . 35

*Smalls v. Collins,* 10 F.4th 117, 144 (2d Cir. 2021) . . . . . . . . . . 54

*Stansbury v. Wertman,* 721 F.3d 84 (2d Cir. 2013) . . . . . . . . . . 36

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993) . . . . . . . . . . 23

*Tangreti v. Bachmann,* 983 F.3d 609 (2d Cir. 2020) . . . . . . . . . . 46

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S.
248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Traggis v. St. Barbara's Greek Orthodox Church,*
851 F.2d 584, 586-87 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . 54

*United States v. Rem,* 38 F.3d 634 (2d Cir. 1994) . . . . . . . . . . . . 24

*Walsh v. City of New York,* 742 F. App'x 557
(2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Yick Wo v. Hopkins,* 118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . 40

<u>Constitutions</u>

United States

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . 31, 35

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . 30, 31, 45

Fourteenth Amendment . . . . . . . . . . . . . . . . . . 30, 31, 45

<u>Statutes</u>

Federal

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 54

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 54

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1986 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

New York State

N.Y. Crim. Proc. Law § 510.40 . . . . . . . . . . . . . . . . . 38-39


*Ordinances*

ABA Model Rule 1.7(a) . . . . . . . . . . . . . . . . . . . . . . . . 27

Town of Oyster Bay

§ 93.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30

§ 246-4.2 . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 30

Local Rule 1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Local Rule 1.5(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## STATEMENT OF JURISDICTION

Subject matter jurisdiction arises under 28 USC U.S.C. §§ 1331 and 1334, and principles of pendant jurisdiction. Claims were filed under 42 U.S.C. §§ 1983 and 1981, 1982, 1985, 1986, and 1988, and Fair Housing Act §§ 3604(a)-(b) and 3617, and *Monell v. Dept. of Soc. Servs.,* and pendant state law claims of I.I.E.D., abuse of process, and malicious prosecution. It arises from the criminal prosecution of appellant, Darren E. Thomas, a black man, by the New York Town of Oyster Bay's ("TOB") deliberately falsely claiming their home's two family use was illegal in order to drive him and his wife out of the house because of his race.

The appeal pursuant to 28 U.S.C. § 1291 lies from a final Order of the District Court (E.D.N.Y.), Hon. Hector Gonzalez, dated September 29, 2023 and entered October 3, 2023, pursuant to FRCP 56, which granted summary judgment dismissing the action, from which a Notice of Appeal was filed on October 17, 2023.

1

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.    Appellants as the Rule 56 motion opponent, especially in the extra-difficult realm of racial discrimination, were denied the proper "most favorable light" criteria on each individual issue below.

II.    Appellees' attorney's conflict should have been declared.

III.    A non-conforming two family use needs no C.O. nor S.U.P., constitutionally exempt from even having to apply therefor.

IV.    Appellants' individual claims:

    A.    Malicious prosecution occurred as racism negates probable cause.

    B.    Appellants were victims of selective enforcement.

    C.    Due Process claim is ripe.

    D.    Genova, Ippolito, and Gioia are liable for the conspiracy they initiated and/or refused to end.

    E.    Gioia's malfeasance negates qualified immunity.

V.    Violations of 42-1981, 1982, 1985, 1986, and F.H. Act

      spring from the foregoing.

VI.   *Monell* is established.

VII.  State claims should be remanded.

## STATEMENT OF THE CASE

Summary

This is a racist selective prosecution in which appellants, Darren and Marlene Thomas, a black husband and Puerto Rican wife, allege that despite Town of Oyster Bay ("TOB") knowing their house was a legal, Pre-Existing ("P-E") Non-Conforming Use ("N-CU") two family house ("2-F") [A. 386, Gaynor Letter and A. 529, 533, 540, Jazwinski Confirmation],* initially in 2007-8 TOB officials conspired to drive them out by falsely claiming it was illegal to deprive them of the rent they needed to afford it. When their efforts were unsuccessful, in late 2008 TOB turned to filing not Building violations but *criminal* charges but only against the black Mr. Thomas [A. 465-68].* Appellants filed this action and an Article 78 in 2011, discovery was conducted, and then this case put on hold until the Article 78 and criminal case were resolved (quickly acquitted in 2019 based on legality of house and racism).[1]

\* Evidence provided but unmentioned in DOC.
\*\* Evidence mentioned but not viewed in light most favorable to appellants.

---

[1] Appellants submit that the acquittal on the same facts could be found to be *de facto* "material" blocking Rule 56 relief.

4

Respondents' Rule 56 motion before Hon. Hector Gonzalez was granted (dismissal) in an Order ("DCO") on September 29, 2023 [SPA. 1-51] and the Notice of Appeal filed.

_____

Appeal

  This appeal focuses on the DCO's reversal of the third Rule 56 principle that the motion opponent's evidence be weighed in the light most favorable to them, according them every inference, and its failure in this racial discrimination case to recognize that their burden is "not heavy" but "minimal" (authorities, *post,* Point 1). Instead appellants' evidence was mostly ignored as the few factual issues noted were summarily resolved in favor of the movants, adopting much of TOB's actual verbiage [SAP 4-7].

  Appellants' Response to Defendants' 56.1 Statement [A. 335-51] and their Counter 56.1 [A. 352-69] expose the many factual issues surrounding the two core material issues of racism: *if the house was known by TOB to be 2-F legal, then "Why" did it prosecute the black husband on the false premise.* These issues were presented, but unidentified, as summary judgment was granted.

Two issues are involved: the house's 2-F legality and TOB's knowledge of it, and the reason for the disparate treatment to which appellants were subjected.  The evidence presented leads to the material issue and its answer, "What else . . . but racism" created this situation.  The situation developed as follows.

_____

The Thomases, a young couple with two boys, sought to purchase a 2-F as their first house, needing the rent to afford the mortgage [A. 391].*  Initially a prospective 2-F in Massapequa was located, owned by a TOB Republican ("GOP") official, told during negotiations of their reason for a 2-F, and price agreed, but he suddenly backed out when he discovered Darren Thomas was black, declaring that his sale to a black man would cause the ruling TOB GOP to end his political career [A. 390-397].* The Thomases found a different 2-F, at 121 Fourth Street, Hicksville, and the GOP official was advised.*

The Hicksville house contract stated it to be a legal 2-F, their title report listed at as a "Tax Class 2**2**0.01" [a 2-F] and "TAX CLASSIFICATION: 220 TWO FAMILY DWELLING," and the 2007-

6

2008 Nassau County Assessor's Card a "Two Family Year-Round Residence," "Property Class 220.01," "A Two Family Dwelling . . . Duplex," and "Living Units 2" [A. 401(3d last line), 427, 431, 433].* They closed and moved in on March 9, 2007, thrilled to be in their first home [A. 415].  The thrill lasted eight months until November 8th when TOB Inspector Curcio stopped, saw the two doorbells and electric meters, noted "Summons to be issued" after "Additional research required" but then never issued a Summons despite being sent back three more times, presumably having researched the house's 2-F status and seeing TOB's computer file with the Assessor's Card, Gaynor Letter, and Jazwinski Confirmation that it was a legal, P-E, N-CU 2-F [A. 434-446, esp. 437 "Insp. Comments"].*  When he refused to file charges against the Thomases, *he was removed*, an action that was labeled by his replacement, Gioia, as "unusual," only done when someone "left the Department" or "reassigned to a different area." [2]  The unusual

_____

[2] The comment confirms that Curcio and Jazwinski were the Inspectors assigned to Hicksville, and that TOB could not use Jazwinski [because of his 2006 finding of 2-F legality, A. 533, 540] and Curcio [because his research revealed its 2-F legality and he would not go along with filing false charges as plotted by TOB].

move resulted in re-assigning the different zone inspector, Gioia, who ignored appellants' 2008 phone and written protests that the house was a legal 2-F [A. 469-70].* Gioia inexplicably visited six times and only then filed *criminal charges* against just the black husband in December, 2008 although both were in title [A. 415, 465-68, 690].*

The 2-F legality of appellants' house, with apartments on the first and second floors, was declared in the June 27, 1968 "Gaynor Letter" as a "legal, P-E, N-CU, 2F, . . . thus no CO necessary" [A. 386].* That legality was again confirmed in late 2006 only months before appellants' March, 2007 purchase by Building Insp. Jazwinski as he resolved a violation for an *illegal third basement apartment,* inspected the house's two apartments, and confirmed the legality based on the Gaynor Letter and by not serving the then owner with a Violation [A. 527-42, esp. 529, 533, 540, "Jazwinski Confirmation"].

For the next three years (2009-11) TOB [Genova, Ippolito] was pressed to drop the charges as mounting evidence of the house's 2-F legality and thus a racist motive surfaced despite TOB's

refusing to disclose _any_ of the house records [A. 380-383, 501-508].**\*** Affidavits were obtained from the adjoining _illegal_ 2-F and 3-F white homeowners, the subject house's prior 1984-6 white owner, and even a former tenant who as a young girl lived with her Mom in the upstairs apartment (1984-96) corroborating the house's "legal 2-F" status [A. 490-94, 497-98].**\***

The definitive source for such information, the County Assessor's Record Card, listed the house four times as a 2-F:

Line
| | | |
|---|---|---|
| 5 | (R/side) | "Two Family Year-Round Residence" |
| 6 | (L/side) | "Property Class Code 220.01" (NYS=2-F) |
| 7 | (R/side) | "A Two Family Dwelling . . . Duplex-Single Owner" |
| 13 | (R/side) | "Full Bathrooms 2" |
| 20 | (L/side) | "Living Units 2" |
| 27 | (L/side) | "Year Built 1926" |

The investigation also revealed four Building Permits had been issued [A. 381, in 1968(2), 1980, 1986, and A. 543-47], four times demanded but refused by respondents [A. 501, 03, 549-70], critical since (1) Permit Applications contained a box as to its "two" family use which would have been checked and then approved by TOB [A. 382, 545-546]**\***, <u>and</u> 2) Permits cannot be issued nor

9

"closed out" (as all were) if the house was an illegal 2-F [A. 653] and all four were "closed" [A. 653],**\*** <u>and</u> 3) during construction Inspectors file multiple inspection reports each containing notes about 2-F use. The 1968 permits also confirmed replacement of both original 1930 electric meters as the service was upgraded [A. 543-44].

When TOB refused to drop the case, in December, 2011 appellants filed this action simultaneously with an Article 78 (prohibition) to which TOB's Answer "Oops'd-included" the Gaynor Letter and Jazwinski Confirmation, both seen by appellants for the first time [A. 520, 533, 540], previously falsely sworn by their prosecutors not to exist [A. 504-08]. Seven depositions were conducted of <u>all</u> <u>five</u> prior owners back to 1962 [A. 491 List, and the 1930-1962 owners Koch family not located], <u>all</u> <u>white</u>, <u>all</u> testifying that as young couples starting out they bought it as a 2-F so the rent would help pay the mortgage, <u>always</u> used it that way, <u>always</u> had two meters-doorbells-mailboxes, <u>never</u> served with Violations from TOB claiming it was an illegal 2-F, and <u>all</u> sold to the next couple as a legal P-E, N-CU 2-F [A. 383; the 435 pages of

10

depositions summarized due to District Court Motion Exhibit page limits].* The two adjoining <u>white</u> homeowners (since 1947 & 1975) who had signed Affidavits [A. 495-498] were also deposed, admitted their respective 2-F and 3-F homes were *illegal* with 2 and 3 meters-doorbells-mailboxes, and had never, ever been cited by the TOB.* All this evidence was ignored in the DCO [SPA 4(5)-7(1)].*

While none of the prior white owners had ever been charged for an illegal 2-F, TOB repetitively falsely claimed that appellants' seller had been so cited by the Town, *but they mislead the court because it was not for an illegal 2-F:* it was for a <u>3rd illegal basement apartment</u>, during which TOB Insp. Jazwinski explicitly noted the legal 2-F use, quoting the Gaynor Letter twice in reporting it to be a "legal, P-E, N-C 2-F dwelling [A. 533, 540].* Thus it was true that no prior white owner of the home had ever been charged for an illegal 2-F.* Again though the DCO accepted TOB's misleading as fact [SPA 4(18)-5(3)].

_____

Documents that would and still could resolve the issue are still hidden by appellees, permitting an adverse inference.

11

Known additionally is that no TOB approval is required [such as
Certificate of Occupancy ("C.O.") nor Special Use Permit ("S.U.P.")]
i.e., contrary to TOB's argument [Point III, *post*; A. 337 #s 4-5, and
340 #s 19-20] and DCO finding [SRA 4(8-11). Its location in a 1-F
zone is irrelevant [Point III, *post*; A. 335-36, #s 1-2]. Its N-CU
status is ineligible for a C.O. for 2-F use, and *it cannot even be
applied for since it was built pre-1943* [A. 386, 650 (§ 246-4.2.1.3),
and 651 (§ 93-28)],* thus the DCO's finding that appellants never so
applied and thus the Due Process claim is unripe, are both
incorrect <u>and</u> <u>also</u> in having accepted movants' false premise
deciding a "material" racism factual issue for them [SPA 4 (8-11);
Point III, *post*]. *Per se* legal by its 2-F construction-use (1930) prior
to the 1943 Zoning Code, <u>and</u> having been used-taxed as a 2-F ever
since [A. 386, 485, 650-51], established *ipse dixit* in TOB's ages old
official "Gaynor Letter" [A. 386], its legal 2-F tax status reported in
the title search [A. 427, 431] and Assessor's Record [A. 485], and re-
affirmed by Jazwinski [A. 533, 540], nevertheless the DCO decided
it in TOB's favor, abasing the proof as appellants' "belief" [SPA 4
(12-16)].

12

TOB's position

False statements about the house's legality infer their ascribed racist plot: **1)** their shunning any mention of its own 1968 Gaynor Letter [A. 386] even to deliberately removing it from their Rule 56 papers [A. 215-29, should have been last Page 16, instead only 15 pages submitted; *contrast*, the whole 16 pages submitted originally by TOB in Art. 78 Return, A. 524-540, as 529];**\*** and **2)** their misleading that the house was classified as "2**1**0.01" [the 1-F class, A. 339, #17] when it was County listed on every tax bill as "2**2**0.01" [the 2-F class, A. 427, 431, 433, 485 and 681 *said 220.01 N.Y.S. Classification since pre-1960];* **\* \*\* 3)** their insistence that the P-E, N-CU 2-F house was illegal in a 1-F zone **\*\*** [A. 352-54, #s 1-10 and 346 # 19] a premise rebutted by TOB's very Ordinances 246-4.2 and 246-4.2.1.3 [A. 650; 352-54]; and **4)** Gioia's statement that he researched the house and it was taxed as a 1-F [A. 702] despite his file copy of the Assessor's Property Card (with his scribbles on it) four times declaring it to be taxed as a "Two Family 220.01" [A. 681].**\*** All four clearly establish the 2-F legality of the house, and because the TOB knew of but disregarded them, and falsified the

charges alleging it was illegal, the "Why" arises, thereby a "genuine material issue."

Gioia, the Inspector who filed the *criminal charges* [not zoning Violations, A. 465-68] after replacing Curcio, the prior Inspector removed because he refused to do so [A. 434-46], presented credibility problems that should have blocked Rule 56-1 level necessary certitude.* Beginning with his very first action visiting Fourth Street, and claiming he observed 2-F use by appellants (2 meters-doorbells-mailboxes), he insisted he never noticed no less criminally charged any such indicia on the other six white-owned multi-family homes on the same block [A. 490], not even the two adjoining ones [0108-0111], *all which were illegal* (not P-E, N-CU) [A. 698]. He could not explain why Curcio was "unusually" removed after four visits having not filed the charges Genova and Ippolito wanted, nor why he six times tried to scare appellants to leave before finally filing charges, unless his behavior was designed to chase the black man out [A. 447-63], nor why he ignored appellants' attorney's letter [A. 464], nor why he filed *criminal* charges for no "2-F CO" and "2-F operation in a 1-F Zone"

14

although the TOB Code was inapplicable [A. 650-51] and not just
Building Code Violations as done in *every* other case in TOB's
380+ year history, nor why the ordinances cited did not apply to a
P-E, N-CU 2-F and yet he filed them anyway [A. 711-718].

Claiming also that he had researched the house's 2-F
legality, his deposition and trial testimony presented numerous
contradictions, leading to the inference he either did no research
because he did need to, or did but disingenuously disregarded its
recorded legal 2-F status: demands [A. 501, 549-69] for "his
reviewed records" [A. 687-739] were refused production [A. 550-51,
561-70]; claimed never to have seen the Gaynor Letter [A. 800-11]
despite it having been seen there before-after by Jazwinski and one
year later Curcio [A. 434-46, 527-542, esp. 529] and then Deputy
Town Attorney Lewis three years later in the Article 78 [A. 510-42],
his denial of seeing the County Property Record Card despite it
being in his file with his scribbles [and swore he did not see "Two
Family" 4x], printed out on the same day he filed the criminal
charge (12/8/2008) [A. 293, lower right corner], established his
conscious disregard of its legal 2-F status [A. 687-702]; his

deposition sporting 388 "D.K.s" and "D.R.s" when cornered with contradictions and untruths [sampled A. 679-749]; and he testified he read the County Clerk deed [A. 415, 742-749] and only Mr. Thomas was the owner [incorrect Marlene Thomas also on deed, A. 468 (34-35)] to avoid the racist inference from TOB's only charging the black man, nor did he ever check just one of the seven other illegal 2-3-4 F homes on the block [A. 490].* **  The DCO adopted appellees' version despite the above [SPA 5(13)-6(11)].

After mentioning little of the above evidence, appellants were stated to have failed to provide any supporting proof [SPA 6(12)-7(11)], followed by an aside that TOB disproved the allegation that it had not prosecuted any other local homeowners for an illegal 2-F use, citing its code enforcement [SPA 7(1-8)] against 27 neighborhood properties.  Once again, TOB had successfully mislead the court, delicately phasing it to avoid Rule 11, as it declared it had taken "code enforcement action" against the twenty-seven properties, hoping appellants would not check them. It was misleading because *only one* involved a 2-F issue, and that was collateral [health and safety issues, the 2-F issue being a

16

basement apartment (again) involved], and thus not rebutting *in the least* the still-100% correct statement that TOB has never prosecuted, *criminally*, any of the white-owned homes in the Town no less immediate neighborhood, <u>falsely</u> or <u>accurately</u>, for a 2-F use. DCO's observation was clearly not reached in the light most favorable to appellants [SPA 7(1-8)] as appellants had clearly refuted TOB's statement [A. 346 #43] as none of the other six illegal multi-family homes on Fourth Street have been charged. And again, TOB's tactic redounds to strengthen appellants' claims of the racist-based selective prosecution. The DCO decree that "Plaintiffs have not refuted this evidence" was noteworthy in that five lines above it, Appellants' Counter 56.1 ¶ 43 is cited (and #39, 42, 47 also) wherein *it was pointedly rebutted* [A. 346, #43; other ¶s A. 345 & 347].

Collateral proof

TOB's ability to find twenty-seven *irrelevant* homeowner files and even produce a sworn statement from one disgraced former official they are concurrently suing, remarkably and conclusively focuses the spotlight on the single file it still iron-

17

fistedly conceals and the only one relevant, the S-B-L for appellants'
home. The adverse inference is unavoidable.

Appellants' cumulative evidence that TOB absolutely
knew the house was a legal 2-F, from their documents obtained and
more importantly the many more concealed, and yet singled out the
only legal multi-family home in the area, who happened to be a
black man who had been rejected shortly before by a TOB official
because of his race, presented *at least* a "genuine material" issue,
incidentally unanimously so found by the petit criminal jury.

Had the above evidence been accorded the most favorable
inferences in appellants' favor, "material" issues would have been
identified.

## **SUMMARY OF THE ARGUMENT**

The DCO did not view the evidence in the light most favorable to appellants and thereby failed to identify the two material issues:  whether TOB knowingly falsely claimed appellants' house was an illegal two family ("2-F"), and if so, "Why?"

Appellants bought the house as a pre-existing ("P-E"), non-conforming use ("N-CU") 2-F, and all available (N.B.) records confirmed it. TOB knew appellants bought the 2-F house because they needed the tenant's rent to afford the mortgage and without tenant they would have to move, and after one year of trying to scare them to leave failed, criminally charged only the black husband, Darren Thomas.  Suspicion of racism grew as investigation found TOB hiding its records claiming there were none until two fortuitously leaked, both establishing its 2-F legality and provoking the next issue as to "Why" TOB would do so.  TOB hid all the rest of the house's volumes including the "S-B-L" file containing all house records.

The Order ("DCO") did not view the evidence in the most favorable light for appellants, indeed unmentioning almost all and

discounting the rest, and in doing so, missed the two main material issues that should have required the motion's denial. Had the evidence been evaluated as required, the issues were summary judgment inappropriate to be left for trial.

TOB's actions at each stage of the criminal case, the Article 78, and this action, reinforced findings favoring appellants. Most powerfully, its claim of no house records until two accidentally emerged, unsurprisingly declaring the house to be a legal, non-conforming two family, thereupon TBO not dropping but pressing the prosecution harder (collaterally proving it was a conspiracy since if a mistake it would have been dropped, with an apology) while continuing to maintain there were no other records despite conclusive contrary evidence, to then undercut the credibility of that claim by producing files for twenty-seven other neighborhood homes.

All the above grew in the context of the confession by TOB's current Supervisor that TOB's GOP was anti-black racist and the later U.S. Department of Justice lawsuit against TOB for anti-black housing policies.

20

Appellants submit that the motion should have been denied because the evidence, viewed as required, presents numerous "racial discrimination case" issues dependent on circumstantial evidence, rarely if ever Rule 56-appropriate.

## POINT I

## THE ORDER REVERSED RULE 56 MOTION CRITERIA.

Standard of Review

In reviewing *de novo* a grant of summary judgment, *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998), appellees' motion was decided under Rule 56 criteria that were all flipped: the evidence was weighed in the light most favorable to the movants, appellants' evidence of racist selective prosecution was neither mentioned nor credited, and the few recognized ambiguities, issues of fact, and inferences to be drawn, were all summarily resolved in movants' favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Movants did not satisfy their burden to establish there were no such issues of material fact, and because there are, summary judgment should have been denied, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *see Gallo v. Prudential Res. Servs.,* 22 F.3d 1219, 1223 (2d Cir. 1994).

Where "discrimination" is the claim, "summary judgment is ordinarily inappropriate" and "a trial court should exercise caution . . . (before) granting (it)" since discrimination involves

22

"intent and state of mind . . . a genuine factual issue," both critical and material herein, *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). Intentional discrimination is a *per se* "elusive factual question," *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 255, n. 8 (1981), as direct proof of intentional discrimination is rare, and the evidence "must be carefully scrutinized for circumstantial proof . . . (to see if) it would show discrimination," *Gallo,* 22 F.3d at 1224 (2d Cir. 1994). Plaintiffs' burden in *prima facie* establishing discrimination "is not a heavy one. One might characterize it as minimal," *Carlton,* 202 F.3d at 134, *citing inter alia St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993), and *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir. 1994) (describing the burden . . . as *de minimis.*" Ordinarily a discrimination case is based on circumstanial evidence, thus raising a material question of fact to be resolved only by the jury, *Carlton,* at 135.

While the Order identified few of the actual disputes as to facts and the inferences to be drawn as to the "elusive factual question of intentional discrimination," those identified were

23

summarily resolved in movants' favor disregarding the rule that the court should not weigh evidence or assess the credibility of witnesses, *United States v. Rem,* 38 F.3d 634, 644 (2d Cir. 1994), such issues including the drawing of legitimate inferences from the facts (being) jury functions," *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999) *citing Anderson,* 477 U.S. at 255; *Carlton,* 202 F.3d at 135. Mirroring the DCO herein, *Hunt* observed, "In doing so (deciding material issues for one party), it either credited (movant) appellees' asserted inferences over those advanced and supported by (opponent) appellants, or did not give appellants the inferences they were due," *Id.,* at 552.

Discrimination - the Burden-Shifting Steps

A methodical process to "progressively . . . sharpen the inquiry into the elusive question of intentional discrimination" is required with a plaintiff first submitting the minimal necessary for a *prima facie* case of discrimination, and once done, the burden shifts to the defense to articulate the legitimacy of its behavior, *Burdine,* 450 U.S. at 248 (1981). Then plaintiff re-assumes the burden of providing evidence challenging the defendant's explanation, as the

24

Court considers plaintiff's *"prima facie* (evidence), together with supportable inferences to be drawn from the false or erroneous character of the . . . (defendant's) proffered reason . . . ,"* Carlton,* 202 F.3d at 135.

Discussion

The proper criteria were duly recited [SPA 11-12] but misapplied in not according appellants the most favorable light on the evidence. Appellants *prima facie* established that the house was a legal P-E, N-CU 2-F through TOB's own records [A. 386, 533, 540, "Gaynor Letter" and "Jazwinski Confirmation"] and the extensive evidence detailed in the Statement of the Case. TOB's concealing the house's files, <u>plus</u> Gioia's evasive and document-proven false testimony, would have been unnecessary if the house was illegal and shown to be so in those files, <u>*plus*</u> TOB's *never addressing its 1968 Gaynor Letter and Jazwinski Confirmation,* its approach demonstrated the "false or erroneous character of the its proffered reason," reinforcing appellant having established the existence of the *Carlton* "not heavy, more like minimal burden . . . multiple material issues of fact."

25

Issues abound Point-Counterpoint in appellants'
Response and Counter 56.1(s) and yet the DCO never mentioned
nor accepted them in the most favorable light [A. 335-69]. Had they
been so treated, the many factual issues would have encircled the
core material factual issue, "Why else . . . but racism" to explain
appellees' behavior, all to be properly resolved by a jury.

## POINT II

## APPELLEES' ATTORNEY'S CONFLICT OF INTEREST [SPA 50]

Standard of Review:

Local Rules 1.4 and 1.5(b)(5) permit disqualification for conflicts of interest - "actual" as well as "apparent," *Glueck v. Jonathan Logan, Inc.,* 512 F. Supp. 223, 228 (SDNY 1981), *aff'd* 653 F.2d 746 (2d Cir. 1981). "Concurrent" representation [ABA Model Rule 1.7(a)] bars attorneys from *concurrently* representing clients where there *is* or *might* *be* a conflict of interest adversely affecting any of them, a "*prima facie* improper and *per se* violation subject to immediate . . . "paradigmatic . . .disqualification," *Papanicolaou v. Chase,* 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989). Attorneys *must be disqualified* when their representation of multiple clients in the same litigation *might* or *appear to* disadvantage any one of the clients, *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir. 1976), with "any doubt to be resolved in favor of disqualification," *Hull v. Celanese Corp.,* 513 F.2d 568, 571 (2d Cir. 1975).

27

<u>Discussion</u>:

Had the DCO stayed the Rule 56 decision until the conflict was addressed, the difficulty would not be now presented, and it is multi-faceted [A. 370-77]: 1) TOB is currently pursuing a clawback action against Genova, labeling him incompetent, malfeasant, grossly legally negligent, and corrupt in receiving bribes to violate his duties to TOB, and for "ly(ing) to the Town, or . . . to the jury and the Court (Azrack, J.), or both," and has since been disbarred [A. 843-52, 1056-11] while TOB urges his denial of involvement as credible in this action; 2) TOB's reliance on his affidavit contradicts counsel's TOB paymaster as to Genova's integrity and credibility, and is remarkable; 3) Genova's and Ippolito's dismissal leaves only Gioia, the lowest, and not the supervisors who ran it, to answer; 4) individual counsel for Gioia would be free to pursue different options.

Thus Gioia's present joint counsel, hired by TOB political leaders, is conflicted. Such situations spark speculation as the tugs on counsel's loyalty are multidirectional in a situation where one client's benefit assuredly will cause another to suffer. Genova and

28

Ippolito were found not liable [A. 13(17)-14(1)], the DCO declaring that finding as moot-ing appellants' conflict disqualification cross-motion [50(1-6)].  Based on the above, it is submitted the sequence should have been reversed as more likely to reveal the goal of U.S. jurisprudence, the "Truth."

**POINT III**

**A P-E, N-CU 2-F HOME BY DEFINITION DOES NOT HAVE NOR NEED A C.O. OR S.U.P., CONSTITUTIONALLY EXEMPT FROM EVEN HAVING TO APPLY THEREFOR.**

A *non-conforming use* by definition does not *conform* to the zone of its location, as TOB twice mislead the court into holding that it is relevant and thus significant. By virtue of its P-E status, it is a definitive N-CU, and *per se* legal [*contra* SPA 4(7-11), 16(3-6)] and its 1-F Zone location is meaningless, but wrongly decided in appellants' disfavor [SPA 4(7-8].

Under New York law, a N-CU is a vested right entitled to constitutional protection under the Fifth-Fourteenth Amendments, *Greene v. Town of Blooming Grove,* 879 F.2d 1061, 1065 (2d Cir. 1989), citing *City of New York v. Bilynn Realty Corp.,* 118 A.D.2d 511, 513-14 (1st Dept. 1986), thereby even prohibiting an ordinance that would require municipal approval, be it a "C.O." or "S.U.P.," and this law is recognized by TOB in its ordinances by its exempting a P-E, N-CU from having to obtain one, §§ 93.28 and 246-4.2 [A. 650-51].

30

## POINT IV

## 42 U.S.C. § 1983 CLAIMS - GENERALLY

Standard of Review

Claims are founded on the Fourth, Fifth and Fourteenth (Sec. 1) Amendments for the racist selective prosecution's, denial of equal protection, malicious prosecution, attempted taking of their property's higher value as a 2-F. The claims were dismissed asserting that 1) Genova and Ippolito were not personally "involved" and 2) Gioia has qualified immunity [SPA 13-14], again not according appellants the "most favorable light" [Point I, *supra*].

Discussion

A.     Genova  [A. 348-51 (#s 50-54), 362-364].

The prosecution began as he was the TOB's #2 Executive (Deputy Supervisor), and continued during his tenure as the TOB Attorney [A. 508] from November 25, 2010 until acquittal on April 5, 2019, thereby supervising-controlling both criminal and civil litigation, and could have ended the prosecution at anytime, as he received monthly reports of the court appearances [A. 348-50 (#s

(50-54), 362-64, 471-84]. He was TOB Attorney when it submitted the 2011 Article 78 Return opposing termination of the prosecution as it denied the property's 2-F legality despite attaching the Gaynor Letter and Jazwinski Confirmation's declaring it "legal" [A. 529, 533, 540] as he doubled down on his prosecutor-subordinate's prior false insistence there were "no records" about the house [A. 501-08]. Genova's persistent refusal to end the prosecution is to be inferred because he was part of the conspiracy.

Genova is now disbarred for DOJ-immunized criminal behavior while TOB attorney, tagged by Judge Azrack [E.D.N.Y.] as a perjuror and bribe taker [A. 1051-66]. The TOB's reliance on his "integrity" while concurrently suing him for a clawback of his salary and bribes [A. 828-42] is a clear conflict of interest exemplifying overall desperation without principle, and should have led to summary denial of his request for dismisal. Genova's refusal to drop this prosecution when requested in light of the TOB records exculpating appellants [A. 469] and concealment of the rest is inexplicable except by his "false or erroneous" excuse as to his personal involvement, noted in *Carlton*, 202 F.3d at 135, as

justification to deny his motion.

B.     Ippolito  [A. 350 (#55), 364-366]

Convicted before Judge Azrack for his TOB corruption, his outlined liability as the Building Department chief and immediate co-supervisor for the courtroom deputies (along with Genova) and to whom many of the courtroom Memos were addressed [A. 471-84], he was repeatedly asked to drop the charges but refused [A. 469, 509, 548], and was the one who denied disclosure of the property file records [A. 382 "Concealed Town Records"].  Appellees argued that he took office on January 15, 2009 after the charges were filed, but the proceedings did not commence until arraignment which occurred one month into his term on February 9, 2009, and he was challenged to drop the case but refused [A. 509, 548].

As with Genova, each of them, while possibly not initiating the conspiracy, had the power to end it, were shown the Gaynor Letter and knew of Jazwinski's Confirmation dual reports verifying the house's 2-F legality [A. 386, 533, 540] but steadfastly continued, inferring their actual participation in the conspiracy.

33

C.    Gioia  [A. 338-343 (#s 11-38), 352-62]

Decreed to be qualifiedly immune [SPA 14(1-2)], it is unavailable to an individual commiting fraud, perjury, or other misconduct [Point IV-E, *post*].  Evidence that Gioia falsely swore that he researched the property's 2-F legality, and the house' 2-F taxation, it not being P-E nor N-CU legal, the husband being the sole owner, not noticing the seven other multi-family homes (2-3-4 F) on the same block, all circumstantially established an untoward motive, since if the house was truly illegal he would not have had to engage in such misconduct, thereby inferentially also proving the racist conspiracy.  Thus *Gallo's* third prong should have compelled a rejection of limited immunity.

34

## A. __MALICIOUS PROSECUTION__   [SPA 14-17]

Standard of Review

A malicious prosecution claim under New York law requires 1) initiation of prosecution, 2) without probable cause, 3) with malice, and 4) a favorable termination, *Posr v. Court Officer Shield #207,* 180 F.3d 409, 417 (2d Cir. 1999).  A fifth is added when it is the basis for a § 1983 claim, i.e., 5) post-arraignment Fourth Amendment level restraint on liberty, *Singer v. Fulton Co. Sheriff,* 63 F.3d 110, 116 (2d Cir. 1995).  Viewed most favorably for appellants, all five were established, *Gallo v. Prudential Res. Servs., 22* F.3d 1219 (2d Cir. 1994).  Of the five elements, the DCO conceded the first two, faulted the third (postulating probable cause) [SPA 14(21-23)], thereby obviating the last two (malice and restraint on liberty) [SPA 17(9-13)].

"Probable cause," defined as facts-circumstances compelling a reasonable conclusion of criminal conduct, *Carroll v. United States,* 267 U.S. 132, 161 (1925), does not exist if appellants' evidence had been viewed in its most favorable light, i.e., the house was a legal, P-E, N-CU 2-F, and, TOB falsely alleged its illegality for

35

a racist reason. "Fraud, perjury, the suppression of evidence or other . . . (mis)conduct undertaken in bad faith" rebuts the "presumption of probable cause," and evidence so viewed finds TOB committing all, *Stansbury v. Wertman,* 721 F.3d 84, 94-95 (2d Cir. 2013).

<u>Discussion</u>

By reversing application of *Gallo's* third prong, "in light most favorable to opponent," probable cause was found. However had the cumulative evidence ["Statement of Case,*" supra*] and appellants' 56.1 Counter and Response been properly credited, the DCO's predicated "probable cause" based on the following "facts" that were irrelevant, incorrect, and disputed, would disappear (serially, SPA 16-17): **1) "Property in 1-F zoned area"** and **"no C.O. nor S.U.P. sought for 2-F"** [SPA 16(3-6, 23)-17(1)] is irrelevant as a N-CU 2-F must of course be in a different (here 1-F) zone to thereby be "non-conforming," and a P-E, N-CU 2-F by law does not need nor can even apply for nor obtain a C.O.-S.U.P. [Point III, *supra*]; **2) "tax status as 2-F or 1-F"** [SPA 16(10-11)] posed as a disputed issue despite 2-F taxed since 1930 [A. 485];

36

**3) "TOB tried to inspect house but was denied"** [repeated twice: SPA 16(12-15) and 17(2-3)], a red herring as the issue is not whether it was being 2-F used (admitted, but as a legal 2-F), *the two critical material issues* never identified were whether the 2-F use was legal, <u>and</u> if so, "Why TOB prosecuted him," as the DCO contrary to *Carlton,* 202 F.3d at 135, summarily decided both issues in movant TOB's favor that it was illegal because its 2-F use violated TOB's Code, never mentioning the Gaynor Letter and Jazwinski Confirmation, nor TOB's concealment of all the house's other records, nor etc., etc. [SPA 16(16-18, 21-23)]; **4) "unclear from** *available* **records whether Property . . . one or two-family home"** [SPA 17(1-2)] on its face reveals it should thereby have been left an issue unresolved, not summarily decided in movant's favor, the "available" especially ironic since TOB hid its records and the only ones to accidentally make it out, the Gaynor Letter and Jazwinski Confirmation, <u>leaked out</u> and conclusively decreed in appellants' favor, with no motion of it in the Order [A. 386, 527-43 esp. 533, 540].

*It is gainsaid that if TOB knew the house was a legal 2-F, there could have been no probable cause to file criminal charges for operating a 2-F house, thus that issue being "material" as a matter of law - and TOB's only records before the court declared the house to be a "legal P-E 2-F, not needing a CO or SUP"* [A. 386, 533, 540]. *It is further indisputable that TOB would not have steadfastly concealed the house's records if they proved the house illegal.* The "fraud, perjury, suppression of evidence or other misconduct," compelled by the evidence and Rule 56 in the "totality of the facts and circumstances," eliminate finding probable cause, *Stansbury v. Wertman,* 721 F.3d at 94-95, and under the "not heavy . . . minimal" evidentiary discrimination threshold decreed in *Carlton,* 202 F.3d at 134, the facts compelled submission to a jury.     Probable cause's absence requires "malice" and a Fourth Amendment restraint on Darren Thomas' liberty be found for appellants. "Malice" is found in the deliberate fabrication of sworn false statements to prosecute him, and the restraint from being "Summon"-ed to court [A-466] and having to appear monthly for the next ten years until acquitted on April 5, 2019, as required by N.Y.

38

Crim. Proc. Law § 510.40; *Rohman v. NYCTA,* 215 F.3d 208, 215-16

(2d Cir. 2000).

**B.**   **<u>SELECTIVE ENFORCEMENT</u>**   [SPA 17-22]

<u>Standard of review</u>

A racially-motivated selective prosecution must establish 1) that the minority plaintiff was prosecuted for an offense while others of the predominant white race committing the same conduct were not, and 2) that the reason plaintiff was prosecuted was due to his race, *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886); *Freedom Holdings v. Spitzer,* 357 F.3d 587, 590 (2d Cir. 2004).

<u>Discussion</u>

Appellants' arguments were rejected without according them the most favorable view of the many facts, rather finding for TOB despite all the evidence connected by the "What else . . . but racism" conclusion.  Now addressed in the DCO's same sequence: appellants' primary claim is <u>not</u> that TOB "selectively enforced the (its) zoning laws against him" [SPA 17(16)], but that it *racistly falsified the house's legal status to drive him out of TOB* through a criminal prosecution.  The *falsity* was proven by TOB's Gaynor Letter-Jazwinski Confirmation, and any doubts about its *racist conspiracy removed* when Genova and Ippolito did not end the

40

prosecution after those two documents emerged, <u>and</u>, their continued concealment of all the house's records. If not directing the plot, they would not have so acted. The other information included in the Statement of the Case substantiates the "racism" motive.

Appellants' evidence on this issue was totally ignored as the DCO declared appellant "alleg(ed) in wholly conclusory fashion that he was treated differently from other similarly situated white individuals . . . based on his race . . . (without) a sufficient comparator" [SPA 18(16-19)]. Appellants' extensive evidence submitted was unread. *Uncredited were comparators in THREE classes: the five prior white owners of the house, and the two adjoining white homeowners, and the seven other white-owned homes on the same block.* In order: <u>Class A</u>: the five prior owners, indisputably all white, and all testified (435 pages) in Florida (2), New Mexico, Maryland, and New York, that it was a P-E, N-CU 2-F, legal, never challenged by TOB, and sold as such to the next in line [A. 383, Section, "42-1983 Discovery Conducted"]; <u>Class B</u>: the adjoining owners, residents respectively since 19<u>48</u> and 19<u>73</u>, and

41

white, corroborated the appellants' predecessors as they also candidly revealed that their homes, one a 2-F and the other a 3-F, were *illegal*, i.e., not P-E, N-CU, and yet still never cited by TOB [A. 495-498, and 383 (last ¶)]; Class C: the other homes on Fourth Street, listed by address, as TOB was demanded to produce for each home, seven kinds of records (Bldg. Dept. file, permit file, *records of prosecution*, C.O.-S.U.P., complaints, tax assessor, etc.) which appellees refused to produce [A. 552-54, 561-63], thereby conceding the issue that they are all white-owned, illegal, and never prosecuted. Class C was sufficiently established [A. 345-7, 56.1, #s 41-47] as TOB never prosecuted any of the seven other Fourth Street homes for an illegal multi-family dwelling, notwithstanding the one violated for non-2-F issues, including Health Code dangers and a basement apartment, as again it was pointed out (but uncredited) that TOB was deliberately misleading the court. *It was stressed that by TOB's production of the twenty-seven other home files, it unwittingly reinforced the inference from its concealment-refusal to produce the only file that mattered, appellants'* [A. 346, #43], but again unmentioned in the DCO.

42

The finding that appellant " . . . cannot establish that the Town's Zoning Code was enforced against him on the basis of his race" [SPA 19(12-13)] ignores the Rule 56 criteria and caselaw observations about racism having to be proven by circumstantial not direct evidence, the whole point of appellants' stressing the question, "What else . . . but racism?" as the evidence led to no other credible explanation.  Another factor: if the prosecution had been an innocent mistake and Genova, Ippolito, and Gioia did not see the Gaynor Letter and Jazwinski's Confirmation before charges were filed [the "unusual" step of Curcio's having been replaced says otherwise], then upon those two items' suddenly escaping on December 14, 2011, TOB (Genova, Ippolito, Gioia) would have dismissed the charges - but did not.  Also, if so, then what possible reason could TOB have had to bare-facedly thereafter bury the house's S-B-L file, refusing multiple demands [A. 509, 548, 549-70] even to the point of its prosecutor falsely denying any in an affirmation [A. 501-08].  Those actions vis-a-vis the twenty-seven other house files produced, raises the certainty of the inference to be drawn from their refusal to produce appellants' file.  Appellants,

43

assisted by TOB, proved the "What else . . .?" answer to be . . . "racism."

The DCO's touting TOB's claim as "established" that Gioia did not have "personal knowledge" of Darren Thomas' race, [19(18-20)] despite Gioia's admission he met him in person [A. 455-56, 691; yet another misleading of the court by TOB in its 56.1, A. 33, #s 27, 28], again begs the question, while also collaterally, unwittingly proving Genova, Ippolito and Saladino's active involvement.  Accepting the answer to the "What else . . .?" question to be "racism" substantially proven by TOB's own actions, and even though it is not true that Gioia had no firsthand knowledge that Darren Thomas is black, then that possibility would inevitably lead to the conclusion that Gioia was indeed sent on his mission by Genova and Ippolito based on Saladino's tip, thereby indirectly knowing his race, and directly proving Genova and Ippolito's liability.

Evaluating the evidence not just in the light most favorable for appellants, but under the rigors of logic and common sense, the circumstantial evidence should be submitted to the jury.

44

## C.   **DUE PROCESS CLAIM IS RIPE**  [SPA 22-23]

As demonstrated in Point III, *supra,* appellants' P-E, N-CU 2-F needs no C.O. nor S.U.P. TOB's criminal charges constitutes "interference" with a P-E, N-CU, under what is called "existing use protection," as it violates the Fifth-Fourteenth Amendments "takings" and Due Process provisions, *Greene,* 879 F.2d at *1064, and simply by "requiring a property with a nonconforming use *to apply* for a special exception permit to continue that use effectively destroyed the property's nonconforming status, . . . thereby (constituting) a substantive due process claim," *One Barberry R.E. Holding, LLC v. Maturo,* 2023 U.S. Dist. LEXI 236738, *131-37 (D. Ct. 2023). Thus appellants' Due Process claim is "ripe" [SPA 4(8-11), 22-23].

**D.**   <u>**SUPERVISORY LIABILITY (GENOVA, IPPOLITO)**</u> [SPA 23-27]

<u>Standard of Review</u>

      To be liable for a § 1983 claim, a supervisory Government official, through his-her own actions or omissions where obliged to act, must have violated the Constitution, *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009); *Tangreti v. Bachmann,* 983 F.3d 609, 616 (2d Cir. 2020). Personal involvement through actions or omissions where duty requires intervention, is necessary.

<u>Discussion</u>

      There is concedingly little direct evidence to comply with the Circuit's presumed standard of Genova's and Ippolito's direct personal involvement and thus the immediate reaction is that their dismissals should stand. However the circumstances and consequence urges a second cautionary review. TOB's behavior herein is so aberrant and organized in its implementation that it is inconceivable that the lowest hierarchical official, Gioia, orchestrated it: he alone had no power to secrete the volumes of records in TOB's S-B-L file, nor to continue the prosecution for eight years after the Gaynor Letter and Jazwinski Confirmation

46

accidentally escaped after three years in the clutches of the upper echelon officials.  Affirmance of Genova's and Ippolito's dismissals, if Gioia's qualified immunity is reversed based on his behavior, will leave him, the lowest at TOB, alone.

The above observations derive from inescapable circumstantial proof, in line with *Gallo, Carlton* and the other caselaw in the opening argument about the *de minimis* standard in discrimination cases, and this a racist one no less, that material factual issues exist whether Genova and Ippolito were the bosses continuing the case after the "escape" of the Gaynor-Jazwinski documents in 2011 proving TOB's premise of the house being illegal, to be false.  Certainly Gioia, whose limited abilities are evident in his stumbling and oft-bewildered testimony disproved by the documentary evidence, had no power to do so, and did not. That decision was made by an upper level executive, also collaterally proving the racist conspiracy.

Finally to be weighed against affirmance of Genova and Ippolito, are their amoral lawless official behavior, both criminally targeted, Genova the attorney slipping the noose by an immunity

47

deal after which he still lied [A. 828-42], and Ippolito convicted.

Genova is liable

The DCO declared reliance on Genova's "declaration under penalty of perjury" in crediting his insistence that he was not actively involved in the prosecution that is contradicted by the circumstances, even without the light most favorable to appellants. His denial was accepted without question [SPA 24(19)-25(9)] despite TOB itself assessing Genova as inveterately dishonest and a serial perjuror, who escaped prosecution by flipping and declaring under oath that his prior under-oath statements were lies, and incidentally disbarred, and incidentally now clawback-sued by TOB [A. 828-42]. Far from relying on his word, it would appear TOB's proffer should have been rejected as insulting to the integrity of the court, deserving a decision denying dismissal. Disqualification of TOB's counsel for his conflict, provoking a candid discussion with independent counsel for Gioia, could "out" Genova, Venditto, Ippolito, and Saladino's roles.

Genova and Ippolito were actively directing the court proceedings [A. 434-63, 469-84, 501-09, 549-70], shown by their

48

December 4, 2011 refusal to drop the prosecution when TOB's previously hidden documents leaked out that the house was a legal 2-F, consistent with two Memos from Genova's courtroom Deputy questioning the "non-conforming status" and "REVIEW FULL HISTORY OF THE PREMISES" [A. 471, 484].

On December 14, 2011 [A. 510-42] when the Gaynor-Jazwinski evidence emerged three years after the criminal case was filed, the two in charge, Genova and Ippolito's conduct proves the conspiracy in two ways: first, they refused to end it, which they would have done if uninvolved and Gioia has made a mistake, and second, they instead doubled down by continuing to conceal the house's remaining records, which inferentially they would not have done if there was no conspiracy - they were both in on it [A. 464, 501-42, 548]. No other explanation is credible, and weighed in the most favorable light and resolving any doubts in appellants' favor, they were "running the show," *Carlton,* 202 F. 3d at 135.

Genova was the TOB attorney when the Gaynor-Jazwinski "out-ing" occurred, and when his deputy prosecutor falsely claimed "no records," and when TOB continued to deny any

records in this suit.  As the active supervisor directing all three,

TOB Attorney Genova is liable.

Ippolito is liable

As not just the Building Dept. head since before the first

court date, he was one of the TOB corrupt troika who controlled all

TOB operations (Venditto-Genova-Ippolito), and of the three corrupt,

two indicted and Genova flipping for immunity [A. 434-63, 469,

471-84, 509, 548, 828-42].  As with Genova, he did nothing to end

the false prosecution after Gaynor-Jazwinski evidence emerged, and

an Ippolito dismissal leaves Gioia solely liable (if his awarded

qualified immunity is reversed).

Result

Those circumstances, mentioned in *Carlton,* are sufficient

to infer that these two officials persevered and continued the

constitutionally violative prosecution.  Their dismissals, it is

submitted, should be reversed and their fate jury-decided.

## E. HAVING ENGAGED IN A RACIST CONSPIRACY, GIOIA IS NOT QUALIFIEDLY IMMUNE. [SPA 30-33]

Standard of Review

"Government officials are <u>not</u> entitled to qualified immunity if 1) the conduct . . . was prohibited by federal law; or 2) the plaintiff's right not to be subjected to such conduct by the defendant was clearly established at the time of the conduct; or 3) the defendant's action was objectively not reasonable in light of the legal rules that were clearly established at the time it was taken," *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Rohman v. NYCTA,* 215 F.3d 208, 216 (2d Cir. 2000).

Falsifying criminal charges has been held to bar qualified immunity: creatively fabricating evidence to make dental billing appear to be fraudulent, *Morse v. Fusto,* 804 F.3d 538 (2d Cir. 2015); conspiratorially falsely charging an individual by perjury before the grand jury, *Coggins v. Buonora,* 776 F.3d 108 (2d Cir. 2015); arresting-charging an individual knowing the complaint was meritless (to help a fellow NYCPD retired officer), *Walsh v. City of New York,* 742 F. App'x 557 (2d Cir. 2018); a police officer's

pressuring witnesses to make a false identification, *Harewood v. City of New York,* 508 F. App'x 60 (2d Cir. 2013), quoting *Good v. Curtis,* 601 F.3d, 393, 398 (5th Cir. 2010); a police officer's laundry list of actions to frame an individual for murder, *Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010). As declared in *Coggins, supra* at 114:

> "Accepting as true the facts alleged and drawing all reasonable inferences in plaintiff's favor, as we must, it is clear that . . . the alleged falsification of evidence and related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise."

Discussion

Crediting the evidence in its most favorable light, Gioia, knowing that the house was a legal 2-F, *falsely criminally* charged the black man, Darren Thomas, to force the couple out of TOB because of his race, and thus Gioia does not qualify under any of the three: 1) racism is clearly prohibited by federal law, and 2) appellants' right not to be falsely prosecuted because of TOB's racism is inarguable, and 3) such conduct is inarguably iniquitous.

52

It was "knowing," racist-purposeful, and does not warrant application of any of the three qualified immunity conditions.

## POINT V

## VIOLATIONS OF U.S.C. §§ 42-1981-82, 1985-86, and FHA ARE SIMILARLY MERITED. [SPA 33-39]

<u>Standard of review</u>

<u>42 U.S.C. §§ 1981-1982</u>

Four elements are necessary for a plaintiff to sustain §§ 1981 and 1982 claims: 1) a member of a racist minority, 2) intent to racially discriminate, 3) involving *inter alia* ownership-use-enjoyment of their home, and 4) injury-loss to person-property, *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 733 (1989); *Smalls v Collins,* 10 F.4th 117, 144 (2d Cir. 2021).

<u>42 U.S.C. § 1985-1986</u>

Essentially the same elements are required as for §§ 1981-1982 except there must also be a conspiracy and an overt act in furtherance of it, *Traggis v. St. Barbara's Greek Orthodox Church,* 851 F. 2d 584, 586-87 (2d Cir. 1988).

<u>Discussion</u>

Addressing 42 U.S.C. §§ 1981-82, evidence of TOB's actions has been submitted, if viewed in the light most favorable to

appellants, to constitute *prima facie* proof of falsification of the house's legal 2-F status for racist motives, *ante.* That proof, if so viewed, establishes 1) Darren Thomas is black, 2) TOB intended to drive him out of Town because of his race, 3) for one of the protected activities (here to reside in one's home without TOB's falsely-based prosecution to deprive him of it), 4) causing him financial and personal injury (emotional, etc.) losses, *Silva v. Farrish,* 47 F. 4th 78, 89 (2d Cir. 2022).

The §§ 1985-1986 elements are similarly met as TOB's (Genova, Ippolito and Gioia) actions-omissions establish a conspiracy to "get" appellants out of Town. The sequence, timing, and especially TOB's pre-Gaynor-Jazwinski concealment of the house records, refusal to end the prosecution when Gaynor-Jazwinski was out-ed, and then their continued concealment contrasted with their production of twenty-seven house files, unquestionably provokes a material issue to be jury decided.

The Fair Housing Act flows from the other theories and its procedural prohibition is unsupportable.

Conclusion

       Plainly if the main claims are reinstated due to the reversed Rule 56 criteria applied, these claims emanating from the identical facts should be restored. To be particularly noted as to the §§ 1985-86 conspiracy claims, they are inextricably intertwined with the claims against Genova and Ippolito, and should be treated similarly.

## POINT VI

### *MONELL* LIABILITY CONFESSED BY INSIDER
_____

Standard of review

TOB's policy or custom causing a violation of appellants' federal constitutional or statutory rights is necessary, *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690-91 (1978).

Discussion

Many a federal court has remarked how amorphous and thus difficult it is to prove a municipal policy to violate a citizen's rights, but TOB provided a hornbook-level spokesman to establish appellants' case in Town Supervisor Saladino's blurted out, anguished, superbly-tailored confession of the Town GOP's racist policy [A. 390-97]. No more discussion need be had except to observe that the United States Department of Justice has also recognized the same *Monell*-level policy as applied to housing within TOB [A. 843-52]. Saladino's remark, supported by TOB's (Genova, Ippolito, Gioia) actions-omissions toward the Thomases, sufficiently establishes the right and liability.

57

## POINT VII

## THE STATE CLAIMS SHOULD BE REMANDED.

Standard of review

Three options are available if federal claims are dismissed: retention, remand, or dismissal, *Novak v. Metro Health Med. Ctr.,* 503 F.3d 572 (6th Cir. 2007).

Discussion

State pendent claims are within the court's discretion for federal continuance in the absence of federal claims but appellants would not seek that relief, as remand to State Court would be requested.

## **CONCLUSION**

When Deputy TOB Attorney Lewis attached the Gaynor Letter and Jazwinski Confirmation to his Article 78 Return [A. 529, 533, 540], there is no way to know if it was done altruistically to expose his superiors, Genova and Ippolito's plot, or simply because the records were relevant. But the impact was game-changing as it confirmed "a racist plot" when those bosses did not then discontinue the prosecution, and "Why else . . . but racism" would TOB have done so to this ordinary middle-class couple. The release exposed TOB's "fraud, perjury, etc." in previously and subsequently denying any house records.

Those two documents were *unmentioned* in the DCO, as it also ignored all of appellants' circumstantial evidence indicating a falsified prosecution for racist reasons. Acquitted in the criminal trial over the same issue of racist-motivated false criminal charges, and now sixteen years along, appellants should have been accorded

the most favorable view, resolving all ambiguities, factual issues, and inferences, in <u>their</u> favor.

Respectfully, the order should be reversed.

Respectfully submitted,

_____

HARRY H. KUTNER, JR., ESQ.

SPECIAL  APPENDIX

i

**SPECIAL APPENDIX
TABLE OF CONTENTS**

|  | Page |
| --- | --- |
| Memorandum and Order, dated September 29, 2023 | SPA-1 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DARREN E. THOMAS and MARLENE
THOMAS,

                    Plaintiffs,

        v.

LEONARD GENOVA, CHRISTINA F. NICOLIA,
as Executrix of the Estate of FREDERICK P.
IPPOLITO, Deceased, CHRISTOPHER GIOIA and
TOWN OF OYSTER BAY,

                    Defendants.

**MEMORANDUM AND ORDER**
11-cv-6084 (HG) (ARL)

**HECTOR GONZALEZ**, United States District Judge:

### Table of Contents

INTRODUCTION ........................................................................................................... 2
FACTUAL BACKGROUND ........................................................................................... 3
PROCEDURAL HISTORY .............................................................................................. 7
LEGAL STANDARD ..................................................................................................... 11
DISCUSSION ................................................................................................................. 12
   I.   Plaintiffs' Section 1983 Claims ......................................................................... 13
      A.   Malicious Prosecution Claim ........................................................................ 14
      B.   Selective Enforcement Claim........................................................................ 17
      C.   Due Process Claim ........................................................................................ 22
      D.   Personal Involvement of Defendants Genova and Ippolito ........................... 23
      E.   Defendant Gioia's Immunity......................................................................... 27
         1.   Absolute Immunity ................................................................................. 28
         2.   Qualified Immunity ................................................................................. 30
   II.   Intentional Discrimination (Sections 1981 & 1982)........................................... 33
   III.  Conspiracy (Sections 1985 and 1986) ............................................................... 36
      A.   Section 1985 Claim ...................................................................................... 36
      B.   Section 1986 Claim ...................................................................................... 39
   IV.  *Monell* Liability .............................................................................................. 39
   V.   Fair Housing Act............................................................................................... 43
      A.   The District Court's Power to Grant Summary Judgment Sua Sponte ........... 44
      B.   FHA Claim ................................................................................................... 46
   VI.  State Claims ...................................................................................................... 49

SPA-2

VII. Plaintiffs' Cross-Motions.................................................................................................. 50

CONCLUSION ......................................................................................................................... 51

## INTRODUCTION

This is an action brought by Darren E. Thomas and Marlene Thomas (collectively, "Plaintiffs") against the Town of Oyster Bay (the "Town"), Leonard Genova, Frederick P. Ippolito,[1] and Christopher Gioia (collectively "Defendants").  Plaintiffs allege that the individual Defendants violated their civil and constitutional rights by engaging in a race-based selective enforcement and malicious prosecution of Plaintiffs in violation of 42 U.S.C. § 1983; deprived Plaintiffs of their right to use their home as a two-family residence without due process of law in violation of Section 1983; intentionally discriminated against Plaintiffs in violation of 42 U.S.C. §§ 1981 and 1982; engaged in a conspiracy in violation of 42 U.S.C. §§ 1985 and 1986; and violated §§ 3604(a)–(b) and 3617 of the Fair Housing Act.  ECF No. 174 (Second Amended Complaint, or "SAC") ¶¶ 108–22, 123–29; 130–34, 135–38.  Plaintiffs further allege *Monell* liability by the Town arising out of a purported equal protection violation.  *Id*. ¶¶ 139–55.  Finally, Plaintiffs raise state common law claims for intentional infliction of emotional distress, abuse of process, and malicious prosecution against the individual Defendants.  *Id*. ¶¶ 156–68.

Before the Court is Defendants' combined motion for summary judgment and to dismiss the SAC, ECF No. 183, as well as Plaintiffs' opposition to the motion for summary judgment and Plaintiffs' motions seeking to disqualify the Town's attorney and to further amend the complaint, ECF No. 182.  For the reasons set forth below, Defendants' motion is granted, and Plaintiffs' motions are denied.

---

[1]    Defendant Ippolito is since deceased.  Plaintiffs substituted his estate as a party.  *See* ECF No. 89.

2

SPA-3

## FACTUAL BACKGROUND[2]

Plaintiffs are residents of the Town, which is located in Nassau County.  Defendant Genova served as the Town's Deputy Supervisor from approximately October 2002 through November 2010 and as the Town Attorney from approximately November 2010 through January 2017.  ECF No. 183-4 ¶¶ 4–5 ("Genova Affidavit").  Defendant Ippolito served as the Town's Commissioner of Planning and Development from approximately January 2009 through January 2016.  ECF No. 183-17 (Ippolito HR Documents).  Defendant Gioia served, at all times relevant to the current action, as a Code Enforcement Inspector in the Town's Department of Planning and Development.  ECF No. 183-5 ("Gioia Affidavit")

Plaintiffs' original complaint and first amended complaint also included claims against John Venditto, who served as Town Supervisor from 1998 through January 2017.  ECF No. 1 (Complaint) ¶ 6; ECF No. 89 (First Amended Complaint) ¶ 6.  Venditto passed away during the pendency of this litigation and was dismissed after Plaintiffs did not timely move to substitute his estate as a party.  ECF No. 124 (Suggestion of Death); ECF Text Order, August 5, 2020.  When Plaintiffs filed their first amended complaint on August 23, 2019, they added as a defendant Joseph Saladino, who has served as Town Supervisor since January 2017.  ECF No.

---

[2]      Except for citations to Plaintiffs' SAC (ECF No. 174), which are included only for context to describe the alleged events that gave rise to Plaintiffs' claims, the information described in this section is based on Defendants' statement of material facts (ECF No. 183-1), Plaintiffs' response to Defendants' statement of material facts (ECF No. 182-1), Plaintiffs' counter-statement of material facts (ECF No. 182-2), and Defendants' response to Plaintiff's statement of material facts (ECF No. 187-9), filed pursuant to Local Civil Rule 56.1, and the exhibits cited therein.  The Court takes to be true facts stated in a party's Rule 56.1 statement that are supported by testimonial or documentary evidence and denied by the other party with only a conclusory statement without citation to conflicting testimonial or documentary evidence.  *See* E.D.N.Y. Local Rule 56.1(c), (d).

SPA-4

89.  Plaintiffs later voluntarily dismissed their claims against Saladino.  ECF No. 154; ECF Text Order, September 27, 2021.

On March 9, 2007, Plaintiffs purchased a home at 121 Fourth Street (the "Property") in Hicksville, a hamlet within the Town.  ECF No. 182-1 (Plaintiffs' 56.1 Resp.) ¶¶ 1, 6.  Darren Thomas is Black, and Marlene Thomas is Puerto Rican.  *Id*. ¶ 33.  Plaintiffs believe that they are the first non-white owners of the Property.  *Id*. ¶¶ 36–37.

The Property was built before the Town established its zoning code, but is currently located in an area zoned for single-family residential use.  *Id.* ¶ 1.  Plaintiffs have not sought, nor has the Town issued, a special use permit to use the Property as a two-family home or a certificate of occupancy for a two-family home.[3]  *Id*. ¶¶ 4–5, 19–20; *see also* ECF No. 183-33 (noting that building records do not show any special use permit on file for the Property).  When Plaintiffs purchased the Property, they believed that it was a legal two-family home, and the Property was set up as such, with two electric meters, two doorbells, and two mailboxes.  ECF No. 182-1 ¶¶ 7, 13.  Plaintiffs have continuously asserted that the Property was originally built and taxed as a two-family home, and that therefore the Property is being used as a legal, non-conforming, two-family home.  *Id.* ¶¶ 4, 7, 15; ECF No. 187-9 (Defendants' Response to Plaintiffs' 56.1 Counter-Statement) ¶ 2.

The previous owner of the Property told Plaintiffs that he had never had any issues with the Town and had listed the Property for sale as a two-family home.  ECF No. 182-1 ¶¶ 37, 49.  Unbeknownst to Plaintiffs at the time of purchase, the previous owner of the Property had been

---

[3]     The parties dispute whether Plaintiffs needed to obtain either a certificate of occupancy or a special use permit in order to use the Property as a two-family home.  ECF No. 182-1 ¶¶ 4–5, 19–20.

subject to a 2006 enforcement action by the Town for illegally renting out the Property's basement as an apartment. *Id.* ¶ 37; ECF No. 187-9 ¶¶ 22–25; *see also* ECF No. 183-14 (Darren Thomas's deposition) at 39–43.

In November 2007, the Town began its efforts to inspect and investigate the Property to determine whether it was being used as a multi-family dwelling. ECF No. 182-1 ¶¶ 12–15.[4] Defendant Gioia made efforts to contact Plaintiffs to schedule an inspection of the inside of the Property, and personally observed during an on-site visit, two doorbells, two electric meters, and electric wires and cable television lines that were separated and extended up to the second floor. *Id.* ¶ 13. Plaintiff Darren Thomas told Defendant Gioia over the phone that he was renting out the upstairs of the Property and admitted to having a second kitchen. *Id.* ¶ 14. However, in a letter sent by their attorney, Plaintiffs asserted that the Property was built and taxed as a two-family home. *Id.* ¶ 15; ECF No. 183-15 (Letter from Plaintiffs' attorney to Town Building Department). Defendant Gioia conducted his own independent research into the Property's use history. ECF No. 182-1 ¶ 16. The parties dispute what Defendant Gioia's research revealed about how the Property had previously been taxed and recorded. *Id.* ¶¶ 16–18, 21–22. Defendant Gioia attests that his review of the Town's tax records indicated that the Property was

---

[4]       The parties dispute the origins of the Town's inspection and investigation. Defendants allege that the inspection began after the Town received a written complaint from a member of the public in October 2007, *see* ECF No. 183-18 (Request for Investigation), that Plaintiffs were maintaining an illegal apartment. ECF No. 182-1 ¶¶ 8–9. Defendants also state that the Town only takes code enforcement action in response to a complaint. *Id.* ¶ 10. Plaintiffs allege that the written complaint Defendants produced in discovery is a "phony subterfuge to cover their racism" and was instead manufactured by Defendants. *Id.* ¶¶ 8–10.

SPA-6

being taxed as a single-family home and not a two-family home as Plaintiffs assert.[5]  *Id.* ¶ 17;

*see also* Gioia Affidavit ¶¶ 28–30; ECF No. 183-27 (Tax Documents).  Plaintiffs admit that

Gioia never saw or interacted with Plaintiffs in-person during this initial investigation other than

over the telephone and thus would not have had independent knowledge of Mr. Thomas's race

before initiating the code enforcement action.  ECF No. 182-1 ¶¶ 27–29.

On December 22, 2008, Defendant Gioia swore out a Court Information charging Mr.

Thomas[6] in Nassau County District Court with two violations of the Town Code:  (1) for

operating a two-family home in a single-family residential zone, Town Code § 246-5.2, and (2)

for operating a two-family home without a proper certificate of occupancy, Town Code § 93-28.

*Id.* ¶ 23; ECF No. 187-9 ¶ 1.  In April 2019,[7] after a jury trial, Mr. Thomas was acquitted of the

two state violation charges brought by the Town.  SAC ¶ 103.

Although Plaintiffs contend in conclusory fashion that the prosecution was initiated

because of Mr. Thomas's race, Plaintiffs have failed to come forward with any proof supporting

---

[5]     The Court notes that it appears both parties are, in part, correct.  Certain records list the Property as being taxed as a two-family home, *see, e.g.*, ECF No. 182-7 at 40, while others list the Property as being taxed as a single-family home, ECF No. 183-27.

[6]     Plaintiff Marlene Thomas was not a defendant in the violation action.  SAC ¶ 66.

[7]     The proceeding had been significantly delayed because Mr. Thomas filed a petition in Nassau County Supreme Court, pursuant to Article 78 of New York's Civil Practice Law and Rules, to dismiss the case against him as a selective prosecution, which stripped the Nassau County District Court of jurisdiction.  The Nassau County Supreme Court dismissed the Article 78 petition, holding that the violation action could continue.  *See Thomas v. Town of Oyster Bay*, 152 A.D.3d 777, 777 (2d Dep't 2017) (describing procedural history prior to appeal).  Mr. Thomas appealed the decision to the Appellate Division, Second Department, which affirmed the dismissal of his petition, *see id.*, and then further appealed to the New York Court of Appeals, which dismissed the appeal because it did not present a "substantial constitutional question." *Thomas v. Town of Oyster Bay*, 88 N.E.3d 391 (N.Y. 2017).

that claim.  ECF No. 182-1 ¶¶ 39–42.  During discovery, the Town produced documents reflecting code enforcement actions that were taken against the owners of 27 residential properties that were each located no more than three-tenths of a mile from the Property.  *Id.* ¶ 43. Defendants also produced documents demonstrating that in 2011, Defendant Gioia commenced a code enforcement prosecution against the owner of a property located within three-tenths of a mile from the Property alleging violations of Town Code Section 246-5.2, one of the code provisions that Mr. Thomas was also charged with violating.  *Id.* ¶ 47.  Plaintiffs have not refuted this evidence.

## PROCEDURAL HISTORY

Plaintiffs initiated this action on December 15, 2011, by filing a complaint against the Defendants and John Venditto.  ECF No. 1.  Defendants moved to dismiss the complaint on April 4, 2012.  ECF Nos. 39–41.  Plaintiffs filed their opposition on May 31, 2012, and simultaneously filed a motion to amend the complaint.  ECF Nos. 32–34.

On February 21, 2013, Judge Seybert granted in part and denied in part Defendants' motion to dismiss the complaint and denied Plaintiffs' motion to amend the complaint.  ECF No. 70.  Judge Seybert dismissed without prejudice Plaintiffs' equal protection claims against the Town, and Defendants Venditto, Genova, and Ippolito in their individual capacities, pending the resolution of the state case against Mr. Thomas.  *Id.* at 13–23.  Judge Seybert also dismissed without prejudice Plaintiffs' due process claims, holding that they were not ripe for adjudication because Plaintiffs had never requested a variance or applied for a permit to use the Property as a two-family home.  *Id.* at 28–30.  Judge Seybert dismissed with prejudice all claims against Gioia, Venditto, Genova, and Ippolito in their official capacities and dismissed Plaintiffs' *Monell* claim

for failure to state a claim.  *Id.* at 25, 33.  After Judge Seybert's order, the "only claims remaining in the complaint [we]re Plaintiffs' equal protection and state law claims against Gioia in his individual capacity."  *Id* at 33.  Because the state proceeding against Mr. Thomas for violating the Town's ordinances was still pending, the Court stayed the remaining claims "pending resolution of the criminal court action," and granted Plaintiffs leave to file an amended complaint after the stay was lifted that pled the following claims:  "(i) [the] selective enforcement claims against Gioia, Venditto, Genova, and Ippolito in their individual capacities; (ii) [the] *Monell* claim against the Town arising out of the purported equal protection violation; and (iii) [the] state law claims against all Defendants."  *Id.* at 20, 33.

The stay remained in effect until Plaintiffs filed a letter motion to reopen the case on April 8, 2019.  ECF No. 81.  On August 15, 2019, Magistrate Judge Lindsay granted Plaintiffs leave to replead their selective enforcement, equal protection, and state law claims.  ECF No. 88.  Magistrate Judge Lindsay also denied Plaintiffs' request to reopen discovery and noted that discovery had closed on November 20, 2012.  *Id*.  On August 23, 2019, Plaintiffs filed their first amended complaint against all Defendants, and added current Town Supervisor Joseph Saladino as a Defendant.  ECF No. 89.

On September 30, 2019, Defendants filed a motion to dismiss the first amended complaint for failure to state a claim.  ECF No. 103.[8]  Plaintiffs ultimately filed their opposition to Defendants' second motion to dismiss a year later on September 30, 2020, after receiving multiple extensions, and initially missing their deadline to file their opposition.  ECF Nos. 144–

---

[8]      Saladino filed a separate motion to dismiss the first amended complaint, after which Plaintiffs filed a letter voluntarily dismissing their claims against him.  ECF Nos. 113, 154.

SPA-9

145.   Plaintiffs' opposition was accompanied by a cross-motion that sought permission to file a second amended complaint and to reopen discovery.  *Id.*  On September 27, 2021, Judge Azrack, who had been reassigned the case, denied Plaintiffs' motion to reopen discovery and granted Plaintiffs' motion to file their second amended complaint.  ECF Text Order, September 27, 2021.  Because the Court granted Plaintiffs' request to amend, Judge Azrack ruled that Defendants' motion to dismiss the first amended complaint was moot and set a schedule for summary judgment briefing.  *Id.*

On February 4, 2022, Plaintiffs filed the SAC.  *See* ECF No. 174.  On March 22, 2022, Defendants served Plaintiffs with their motions for summary judgment and to dismiss.[9]  ECF No. 183.  On June 15, 2022, Plaintiffs filed their opposition to Defendants' motion, their opposition to Defendants' Rule 56.1 statement, their Rule 56.1 counter-statement, and motions to disqualify Defendants' counsel and to file a third amended complaint.  ECF No. 182.  On July 8, 2022, Defendants filed their reply and response to Plaintiffs' Rule 56.1 statement.  ECF No. 187.

While Plaintiffs have not filed their own motion for summary judgment, they appear to have filed their opposition to Defendants' motion as if it were an independent motion for

---

[9]      As discussed, Defendants did not have an opportunity to move to dismiss the claims pled in the first or second amended complaint through no fault of their own.  Although Defendants moved timely to dismiss the first amended complaint, Plaintiffs' continuous extension requests and delay tactics meant that Plaintiffs' opposition was filed exactly a year later, concurrent with its motion to file the SAC.  Rather than rule on Defendants' motion to dismiss the first amended complaint, the Court allowed Plaintiffs to file the SAC and denied the motion to dismiss as moot.  The Court will now consider Defendants' combined motion for summary judgment and to dismiss.  *See, e.g.*, *G.B. by and through Barbour v. Orange Southwest Supervisory Dist.*, 838 F. App'x 570, 571 (2d Cir. 2020) (affirming the district court's decision to grant defendant's motion to dismiss and for summary judgment); *Jones v. U.S. Dep't of Educ.*, No. 09-cv-88, 2010 WL 10092765, at *1 (S.D.N.Y. Feb. 1, 2010) (ruling on defendant's motion to dismiss and for summary judgment).

summary judgment against Defendants.[10]  However, in substance, Plaintiffs' papers function as an opposition to Defendants' motion and the Court will treat them as such.  Plaintiffs' papers go through the arguments made in Defendants' motion point-by-point in an effort to rebut these arguments, and make little to no independent case for summary judgment in their own favor.  ECF No. 182-5 at 4–25.  Plaintiffs cite to case law and facts only to rebut Defendants' summary judgment arguments rather than to support an independent basis for summary judgment for Plaintiffs.

Additionally, the deadline for either party to move for summary judgment, as set by Judge Azrack on February 3, 2022, was March 15, 2022.  ECF No. 173.  On March 10, 2022, Judge Azrack granted Defendants' request for an extension, ordering Defendants to serve their motion papers on or before March 22, 2022.  ECF Text Order, March 10, 2022.  Even giving Plaintiffs the benefit of an extension that they did not request, Plaintiffs did not serve any motion papers on March 22, 2022.  Instead, Plaintiffs served their papers on May 24, 2022, the deadline Judge Azrack set for *responses* to summary judgment motions.[11]  ECF Text Order, May 4, 2022. Accordingly, any effort by Plaintiffs to characterize their motion as an independent motion for summary judgment is both procedurally improper and not supported by the substance of Plaintiffs' papers.  The Court will therefore analyze Plaintiffs' papers as an opposition to Defendants' motion for summary judgment.

---

[10]     "Plaintiffs have more than established prosecution inexplicable except by racism. Defendants' motion papers tacitly concede plaintiffs' entitlement to summary judgment."  ECF No. 182-5 at 2.

[11]     In Plaintiffs' letter seeking an extension of their deadline to file, Plaintiffs requested an "extension for plaintiffs' opposition to the pending Rule 56 motion" and not an extension to file their own motion for summary judgment.  ECF No. 176.

SPA-11

Additional letters were filed after the motion.  On July 20, 2022, Plaintiffs filed a letter alerting the Court that Defendant Genova had been disbarred, which Defendants claimed was irrelevant to the current case, and which Plaintiffs responded was relevant to the credibility of Defendant Genova.  ECF Nos. 189–191.  The Court advised the parties that it would take the letters under advisement when reviewing the motion papers.  ECF Text Order, July 29, 2022.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, a court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).[12]  The moving party has the burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  "The mere existence of a scintilla of evidence" in support of the non-movant will not alone defeat a summary judgment motion.  *Anderson*, 477 U.S. at 322–23.

In deciding a summary judgment motion, any ambiguities and inferences drawn from the

---

[12]    Unless noted, case law quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

11

facts must be viewed in the light most favorable to the nonmoving party.  *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995).  Although "courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments," the non-moving party must defeat summary judgment by putting forth "evidence on which the jury could *reasonably* find for the non-moving party."  *Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 456 (2d Cir. 2022) (emphasis in original) (affirming summary judgment dismissing complaint).  "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion," rather the nonmoving party must "go beyond the pleadings and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

## DISCUSSION

Plaintiffs bring ten claims against the individual Defendants and the Town.  Plaintiffs' first claim for relief alleges that the individual Defendants engaged in a race-based selective prosecution of Mr. Thomas in violation of Section 1983, and the Fourth, Fifth, and Fourteenth Amendments.  Plaintiffs' second and third claims for relief allege that the individual Defendants intentionally discriminated against Plaintiffs and deprived them of their equal rights in violation of Sections 1981 and 1982. SAC ¶¶ 123–29.  Plaintiffs' fourth and fifth claims for relief allege that the individual Defendants engaged in, and neglected to prevent, a conspiracy against Plaintiffs in violation of Sections 1985 and 1986.  *Id.* ¶¶ 130–34.  Plaintiffs' sixth claim for relief alleges that the individual Defendants violated Sections 3604(a)–(b) and 3617 of the Fair Housing Act ("FHA") by attempting to prevent Plaintiffs from residing in the Property.  *Id.* ¶¶ 135–38.  Plaintiffs' seventh claim for relief alleges *Monell* liability on the part of the Town for

allegedly creating and encouraging a policy to "prevent African-American and non-white individuals from residing in the Town." *Id*. ¶¶ 139–55. Plaintiffs' eighth, ninth, and tenth claims for relief assert state law tort claims against the individual Defendants for intentional infliction of emotional distress, abuse of process, and malicious prosecution, respectively. *Id*. ¶¶ 156–68.

### I.      Plaintiffs' Section 1983 Claims

Although Plaintiffs' first claim for relief is not clearly framed, it appears to allege that the individual Defendants:  (1) violated Plaintiff Darren Thomas's Fourth Amendment rights by maliciously prosecuting him without probable cause; (2) violated Plaintiff Darren Thomas's equal protection rights by selectively enforcing the Town's zoning laws against him; and (3) violated Plaintiffs' due process rights to use the Property as a two-family home.[13] SAC ¶¶ 108–22.  "Under Section 1983, individuals may bring a private cause of action against persons acting under color of state law to recover money damages for deprivations of their federal or constitutional rights." *Sagy v. City of New York*, No. 18-cv-1975, 2022 WL 6777602, at *2 (E.D.N.Y. Oct. 11, 2022).  To establish a Section 1983 claim, a plaintiff must show that "a person acting under color of state law" violated "a right secured by the Constitution and laws of the United States." *Id*.

Here, the Court grants Defendants' summary judgment motion and dismisses Plaintiffs' Section 1983 claims against the individual Defendants on the merits of each claim and because (i) there is no genuine issue of material fact as to whether Genova or Ippolito were personally

---

[13]      Because Marlene Thomas was not a defendant in the code enforcement action, which forms the basis for Plaintiffs' malicious prosecution and selective enforcement claims, the Court interprets the SAC as alleging those claims on behalf of Darren Thomas only.  SAC ¶ 66.

involved in the alleged constitutional violations, and (ii) there is no genuine issue of material fact as to whether Gioia has qualified immunity from suit.

A.    *Malicious Prosecution Claim*

Mr. Thomas brings a Section 1983 claim for malicious prosecution.  To succeed on his claim, he must show "a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022).  Under New York Law, "the elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *see also Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016) (same).  "In addition, to prevail on a cause of action for malicious prosecution under Section 1983, the plaintiff must establish that there was sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Perez v. City of New York*, No. 20-cv-1359, 2022 WL 4236338, at *13 (S.D.N.Y. Sept. 14, 2022); *see also Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) ("The Fourth Amendment Right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty.").

With respect to the first two elements, the parties do not dispute that a zoning proceeding was initiated against Mr. Thomas in 2008 or that Mr. Thomas was acquitted in 2019.  ECF No. 182-1 ¶ 23, ECF No. 81.

With respect to the third element, Defendants have shown that there is no genuine issue as to any material fact such that the Court can conclude, as a matter of law, that Defendants did not lack probable cause.  "[T]he existence of probable cause is a complete defense to a claim of

malicious prosecution in New York." *Savino*, 331 F.3d at 72. "If there was probable cause for the prosecution, then no malicious prosecution claim can stand." *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). This is true even if a plaintiff alleges that he was prosecuted because of his race or another characteristic that government officials may not permissibly consider when commencing criminal proceedings. In such instances, the plaintiff may have a valid claim for selective prosecution in violation of the Equal Protection Clause, but his claim for malicious prosecution in violation of the Fourth Amendment will fail. *Espinoza v. City of New York*, No. 11-cv-2108, 2012 WL 4761565, at *4–5 (S.D.N.Y. Aug. 3, 2012) (granting summary judgment dismissing malicious prosecution claim because "whatever motivated the officers to issue [tickets against plaintiff], it is undisputed that they had probable cause to do so" but declining to dismiss selective prosecution claim because "[t]he fact that there was probable cause to ticket [plaintiff] does not defeat this particular cause of action"); *see also Jones v. J.C. Penny's Dep't Stores*, 317 F. App'x 71, 74 (2d Cir. 2009) (affirming summary judgment dismissal of malicious prosecution claim based on lack of probable cause but explaining that "[p]robable cause for arrest is not a complete defense to a selective prosecution claim").

"In the malicious prosecution context, probable cause is the totality of facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Gordon v. City of New York*, No. 15-cv-2439, 2016 WL 10678073, at *4 (E.D.N.Y. July 22, 2016); *see also Keyes v. City of New York*, No. 21-cv-2406, 2023 WL 176956, at *2 (2d Cir. Jan. 13, 2023) ("Probable cause exists when officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. This determination is based on the totality of the circumstances[]."). "Probable cause may also exist where the officer

15

has relied on mistaken information, so long as it was reasonable for him to rely on it."

*Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010).

Defendant Gioia plainly had probable cause to initiate a prosecution against Mr. Thomas. The parties agree that the Property is located in an area that is zoned for single-family residential use and that Plaintiffs do not have, and have never sought, a special use permit or certificate of occupancy permitting them to use the Property as a two-family home. ECF No. 182-1 ¶¶ 1, 4–5, 19–20. The parties also agree that the Property has two electric meters, two doorbells, and two mailboxes. *Id.* ¶¶ 7, 13. Whether the Property was taxed as a single-family or two-family home is a factual issue that the parties dispute. However, even drawing all inferences in the light most favorable to Plaintiffs, the record is clear that certain records reflected that the Property was taxed as a single-family home while others reflected that it was taxed as a two-family home. *Compare* ECF No. 182-7 at 40, *with* ECF No. 183-27. The parties do not dispute that the Town and Defendant Gioia attempted, unsuccessfully, to inspect the interior of the Property on multiple occasions, including by seeking Plaintiffs' consent, and that Mr. Thomas told Mr. Gioia on a phone call that he was renting out the upstairs of his Property. ECF No. 182-1 ¶¶ 12-14.

Based on the totality of these circumstances, as a matter of law, a person of reasonable caution would be justified in believing that the Property was being used in a manner that violated the Town's zoning code. *Keyes*, 2023 WL 176956, at *2; *see also Kent v. Thomas*, 464 F. App'x 23, 26 (2d Cir. 2012) (holding that the prosecuting party is "not required to explore and eliminate every plausible claim of innocence before making an arrest" and that "the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause"). The Property was admittedly and visibly being operated as a two-family home in a one-family zone; Plaintiffs had no special use permit or certificate of occupancy permitting the use of the Property

as a two-family home; it was unclear from available records whether the Property had historically been operated as a one or two-family home; and, despite making contact with Plaintiffs, the Town inspectors were not permitted to inspect the Property.  Accordingly, based on these undisputed facts, there was probable cause to commence a code enforcement action against Mr. Thomas.  *See Lepper v. Vill. of Babylon*, No. 18-cv-7011, 2022 WL 939719, at *22 (E.D.N.Y. Mar. 29, 2022) (finding that in a case regarding disputes over land-use, permits, and zoning requirements, defendants had probable cause to commence an action based on their own observations of the property).

Because the Court finds that Defendants acted on the basis of probable cause, the Court does not need to reach the question of whether Defendants displayed malice[14] in initiating an action against Mr. Thomas or whether Defendants restrained Mr. Thomas's liberty.  Since probable cause is a complete defense to an action for malicious prosecution, Plaintiffs' claim fails, and Defendants are entitled to summary judgment.  *Savino*, 331 F.3d at 72.

> B.    Selective Enforcement Claim

Mr. Thomas also brings a Section 1983 claim alleging that Defendants violated his equal protection rights by selectively enforcing the Town's zoning laws against him.  "To prevail on

---

[14]    While the Court does not need to reach the issue of malice, nevertheless, Plaintiffs have failed to allege or demonstrate any malice on the part of the individual Defendants.  *See Sorrell v. Cnty. of Nassau*, 162 F. Supp. 3d 156, 170 (E.D.N.Y. 2016) ("Malice in the context of malicious prosecution . . . means only that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.  Actual malice is lacking when a police officer reasonably chooses between conflicting evidence."); *Lovelace v. City of New York*, No. 02-cv-5398, 2005 WL 552387, at *3 (E.D.N.Y. Mar. 9, 2005) (granting summary judgment and finding that plaintiff had not met her burden to show that she was prosecuted with a wrong or improper motive when the court found that her arrest was "made on probable cause and plaintiff has adduced no evidence from which it could be inferred that the prosecution was commenced out of malice").

SPA-18

such a claim, a plaintiff must prove that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019). "When evaluating an equal protection . . . claim . . . the first question that must be asked is whether the plaintiff has proffered a sufficient comparator." *Hu v. City of New York*, No. 17-cv-2348, 2022 WL 182360 at *9 (E.D.N.Y. Jan. 20, 2022), *aff'd*, No. 22-cv-183, 2023 WL 3563039 (2d Cir. May 19, 2023). "[T]he plaintiff's and comparator's circumstances must bear a reasonably close resemblance," but "[t]hey need not, however, be identical." *Hu*, 927 F.3d at 96. "A plaintiff can prevail by showing that []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [him]self." *Id.* Although, in general, "whether individuals are similarly situated is a factual issue that should be submitted to the jury," where it is clear that "no reasonable jury could find the similarly situated prong of a selective enforcement claim met, a court can properly grant summary judgment." *Hu*, 2022 WL 182360, at *9.

Mr. Thomas alleges in wholly conclusory fashion that he was treated differently from other similarly situated white individuals living in his neighborhood, and that his treatment was based on his race. *See, e.g.*, SAC ¶¶ 96–101. However, he has failed to proffer a sufficient comparator. Mr. Thomas states that there are multiple other homes in his neighborhood that display outward indicia of multi-family use and that, upon information and belief, none of the other homes are legal multi-family dwellings. *Id.* ¶¶ 90–91. He asserts, upon information and belief, that the other homes are owned by white owners and that none of the other owners has been prosecuted for code violations. *Id.* ¶¶ 92–94. However, at the summary judgement stage,

18

assertions upon "information and belief" are insufficient to establish that there exists a genuine issue of material fact. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *see also* Fed. R. Civ. P. 56(e). And, as Mr. Thomas concedes, he cannot point to any evidence to support his claims about his neighbors. Mr. Thomas does not know his neighbors' race or ethnicity and has never attempted to find out. ECF No. 182-1 ¶¶ 41–42. Mr. Thomas also admits that code enforcement actions were taken against the owners of 27 residential properties located within three-tenths of a mile of the Property—including, most notably, the previous owner of the Property who was white—although he asserts that none of the actions resulted in code violation prosecutions. *Id.* ¶¶ 43, 47. Because Mr. Thomas cannot point to a single neighbor who can serve as a comparator, it is clear that "no reasonable jury could find the similarly situated prong of a selective enforcement claim met." *Hu*, 2022 WL 182360 at *9.

Mr. Thomas also cannot establish that the Town's zoning code was enforced against him on the basis of his race. Under this element, Mr. Thomas must prove that "the disparate treatment was *caused* by the impermissible motivation." *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94–95 (E.D.N.Y. 2011) (emphasis in original). However, Mr. Thomas has failed to present evidence by which a rational jury could infer any impermissible considerations by the Town even construing the facts in the light most favorable to Mr. Thomas. *Vassallo v. Lando*, 591 F. Supp. 2d 172, 186 (E.D.N.Y. 2008). Defendants have established that the Town official who initiated the action against Mr. Thomas did not have personal knowledge of Mr. Thomas's race until well after the action was filed. ECF No. 182-1 (Plaintiffs' 56.1 Resp.) ¶¶ 27–29. Additionally, Plaintiffs concede that they are not aware of: (1) any conversation in which they participated with any Defendant or other individual that supports their belief that the prosecution was racially driven or motivated; (2) any hearsay evidence that supports their belief that the

19

prosecution was racially driven or motivated; or (3) any evidence about the race or ethnicity of the owners of other homes in the Property's vicinity. *Id.* at ¶¶ 39–42. Mr. Thomas can neither prove that he was treated differently from similarly situated individuals nor that his treatment was based on impermissible considerations related to his race. Accordingly, Defendants' motion for summary judgment on Mr. Thomas's selective enforcement claim is granted.

In Plaintiffs' counsel's affirmation in opposition to Defendants' motion for summary judgment, he states, for the first time, that Plaintiffs are alleging a violation of their equal protection rights under a "class of one theory" as well as a selective prosecution theory. ECF No. 182-3 at ¶ 5. The SAC does not contain any suggestion that Plaintiffs are proceeding under a "class of one" theory with respect to their Section 1983 claims, *see* SAC ¶¶ 108–122, and Plaintiffs' opposition to Defendants' motion for summary judgment contains only a single reference to their "class of one" claim. ECF No. 182-5 at 15. It is within the Court's discretion to decline to reach the merits of an argument raised for the first time in opposition to summary judgment. *See, e.g., Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (finding that the district court did not abuse its discretion in declining to consider new theories of liability raised for the first time in opposition to summary judgment); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of an argument raised for the first time in opposition to summary judgment). Accordingly, the Court does not need to consider Mr. Thomas's class-of-one claim.

However, the Court notes that Mr. Thomas's equal protection claims would also fail under a class-of-one theory of liability. "Plaintiffs who allege a Fourteenth Amendment class-of-one claim must show that they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. The claim requires an

20

extremely high degree of similarity between [the plaintiff] and its comparators." *Lepper v. Scordino*, No. 22-cv-1064, 2023 WL 4004220, at *2 (2d Cir. June 15, 2023) (affirming summary judgment dismissing plaintiff's class-of-one equal protection claim). A plaintiff bringing a claim on class-of-one grounds must establish that it is prima facie identical to a comparator by showing that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Hu*, 927 F.3d at 94. "Plaintiffs must demonstrate that they were intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose is all but certain." *Lepper*, 2023 WL 4004220, at *2.

In analyzing Mr. Thomas's selective enforcement claim, the Court has already found that he has not proffered facts sufficient to establish that he was treated differently from similarly situated individuals. *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 255 (E.D.N.Y. 2010) ("[P]laintiffs' class of one claim fails because, as with their selective enforcement claim, plaintiffs cannot show that they were treated differently than similarly situated individuals."). As articulated by courts in this Circuit, the standard of proof to determine whether a Plaintiff was treated differently from similarly situated individuals, "is more stringent" on a class-of-one claim than it is on a selective enforcement claim. *Id.* at 256 (holding that defendants were entitled to summary judgment on plaintiffs' class-of-one claim). Therefore, because Mr. Thomas has failed to point to evidence that suggests he was treated differently from others who were similarly situated, Defendants would also be entitled to summary judgment on his equal protection claim as analyzed under the "more stringent" class-of-one standard. *Id.* ("[B]ecause

21

plaintiffs have failed to satisfy the similarly situated element of [their] selective enforcement claim, they cannot satisfy it for a class of one claim.").

### C.    Due Process Claim

On February 21, 2013, Judge Seybert dismissed without prejudice Plaintiffs' due process claims for deprivation of their right to use the Property as a two-family home without due process of law, finding that the claims were not ripe. ECF No. 70 at 28–30. Specifically, she held that because Plaintiffs "never requested a variance or applied for a permit to use the Property as a two-family home, their due process claims are not ripe and must be dismissed." *Id.* at 30. As Judge Seybert explained, a cause of action is only "justiciable" if it is "ripe," *i.e.*, it presents "a real, substantial controversy, not a mere hypothetical question." *Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 511 (2d Cir. 2014), *abrogated on other grounds by Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162 (2019).   In the land-use context, a constitutional claim is ripe if Plaintiffs have "obtain[ed] a final, definitive position as to how [they] could use the property from the entity charged with implementing the zoning regulations." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88–89 (2d Cir. 1988) (expanding the land-use ripeness test to procedural due process claims challenging land-use restrictions); *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 294 (2d Cir. 2022) (explaining that courts within the Second Circuit have applied the land-use ripeness test including to zoning challenges based on substantive due process).

When Judge Seybert initially dismissed Plaintiffs' due process claim, she found that Plaintiffs' claims were not ripe because Plaintiffs had not "requested a variance or applied for a permit to use the Property as a two-family home." ECF No. 70 at 30. Plaintiffs admit that they

still have not sought a variance or special use permit.  ECF No. 182-1 ¶¶ 19–20.  Accordingly, as Judge Seybert has already held, Plaintiffs' due process claim is not ripe and must be dismissed.

### D.  *Personal Involvement of Defendants Genova and Ippolito*

Defendants also argue that they are entitled to summary judgment on Plaintiffs' Section 1983 claims against Defendants Genova and Ippolito because there is no genuine issue of material fact that the two Defendants—who were both employed by the Town during a portion of the period when Mr. Thomas was being prosecuted[15]—were not personally involved in the alleged constitutional deprivation.  ECF No. 183-44 (Defendants' memorandum) at 8–11.  The Court agrees.

"A prerequisite for any award of damage under 42 U.S.C. § 1983 for an alleged constitutional violation is the personal involvement of the defendant."  *Cruz v. City of New York*, 232 F. Supp. 3d 438, 452 (S.D.N.Y. 2017).  "The participation of each defendant is a requirement, because defendants in a § 1983 action cannot be held liable for damages for constitutional violations merely because they held a high position of authority."  *Fowler-Washington v. City of New York*, No. 19-cv-6590, 2023 WL 2390538, at *6 (E.D.N.Y. Mar. 7, 2023).  "To establish a violation of Section 1983 . . . Plaintiff[s] must establish a deliberate, intentional act on the part of [Defendants] to violate the plaintiff's legal rights."  *Marhone v. Cassel*, No. 16-cv-4733, 2022 WL 4468056, at *4 (S.D.N.Y. Sept. 26, 2022).

Here, Plaintiffs claim, "upon information and belief," that Genova and Ippolito:  (i)

---

[15]     Genova's employment with the Town ended on January 9, 2017, before Mr. Thomas's state case was resolved.  ECF No. 183-4 ¶¶ 4–5 ("Genova Affidavit").  Ippolito began working for the Town after the prosecution had commenced, and he passed away before its completion. ECF No. 183-17 (Ippolito HR Documents).

23

"pulled . . . Gioia[] from his usual territory . . . [and] assigned him plaintiffs' case" and "order[ed] him to harass plaintiffs to get them to move," including ordering him to file charges against them, SAC ¶¶ 50, 70; and (ii) concealed records related to the Property, *id.* ¶¶ 56, 76. Plaintiffs also refer to Genova and Ippolito as having prosecuted Plaintiffs' state code enforcement case, *id.* ¶¶ 64, 67 ("defendants filed the criminal prosecution"), however, Plaintiffs admit that specific prosecutorial actions were not taken directly by Genova or Ippolito but were done through their subordinates, including the Town's Deputy Attorney, who is not a party in this case. ECF No. 182-1 ¶¶ 51–55; *see also* ECF No. 182-5 at 6 (arguing Genova and Ippolito are liable because they "oversaw" the prosecution). Plaintiffs further argue that Genova's and Ippolito's personal involvement is shown because "after being personally advised about [Mr. Thomas's] claim of innocence" they refused to drop the prosecution even though, "each had the power to." ECF No. 182-5 at 5; *see also* ECF No. 182-1 ¶¶ 51, 55. Plaintiffs have not provided a single fact to substantiate their first claim, that Genova and Ippolito directed Gioia to investigate the Property or to bring criminal charges. SAC ¶¶ 50, 70; *see also* ECF No. 182-1 ¶ 27–29, 39–40. Plaintiffs did not even depose Genova or Ippolito to examine them about these allegations.[16] ECF No. 182-1 ¶ 50. At the summary judgement stage, assertions upon "information and belief" are insufficient to establish that there exists a genuine issue of material fact. *See Patterson*, 375 F.3d at 219; *see also* Fed. R. Civ. P. 56(e).

Genova, who was Deputy Town Supervisor during the investigation and initiation of Mr. Thomas's prosecution, submitted a declaration under penalty of perjury in which he states that he

---

[16]   Ippolito died in 2017, years after the close of discovery in this case. *See* Frederick Ippolito, ex-town official, dies, available at https://perma.cc/CVN2-Q6WF (last visited September 29, 2023).

was not involved with or aware of Gioia's investigation or decision to bring charges against Mr. Thomas, denies concealing any documents or knowing about any documents that might have been concealed, and states he was never asked to intervene in the code enforcement action.  ECF No. 183-4 ¶¶ 13–16.  In 2010, after Mr. Thomas's prosecution had already been initiated, Genova was appointed Town Attorney.  *Id.* ¶ 5.  However, Mr. Thomas's prosecution was not carried out by Genova, but by attorneys he supervised.  ECF No. 182-1 ¶ 51.  Genova denies reviewing or intervening in Mr. Thomas's state court action during his tenure as either Deputy Supervisor or Town Attorney.  ECF No. 183-4 ¶¶ 8–17.  Plaintiffs do not point to any evidence to refute any of these assertions.

Where, as here, Defendants have demonstrated "the absence of a genuine issue of material fact," Plaintiffs must "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown*, 654 F.3d at 358.  However, Plaintiffs provide no specific facts to show that Genova ever personally participated or took part in either the investigation of the Property or subsequent prosecution of Mr. Thomas.  ECF No. 182-1 ¶¶ 51– 54.  Rather, Plaintiffs baldly argue that Genova's personal "participation in the conspiracy can be inferred from his contemporary actions in *ex parte* continuing the prosecution," even if he was initially unaware or did not participate.  *Id*. ¶ 52.  Specifically, Plaintiffs argue that Genova is liable because he personally failed to "order to [sic] prosecution dropped" after evidence that Mr. Thomas was innocent allegedly arose in the state case.  *Id*. ¶ 51.  Plaintiffs point to no evidence to support these claims.  And, even if true, simply being made aware of facts which may have exonerated Mr. Thomas is insufficient to establish personal involvement on the part of Genova.  *See Weiner v. McKeefery*, 90 F. Supp. 3d 17, 36–37 (E.D.N.Y. 2015) (noting that to assert a claim against a prosecutor for continued prosecution after a prosecutor becomes aware of facts

25

sufficient to exonerate the accused, plaintiff must show that the defendant took an "active part in the proceedings"). To the extent that Plaintiffs are arguing that Genova was personally involved simply because he supervised those who prosecuted Mr. Thomas's state case, the law is clear that supervisory responsibilities alone do not establish personal involvement in Section 1983 actions. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("To establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights.").

The evidence against Ippolito is even more scant. Records show that Ippolito was not an employee of the Town until after the initiation of Mr. Thomas's state case, when he was hired as the Commissioner of Planning. ECF No. 182-1 ¶ 55 (admitting that Ippolito was not an employee of the Town until after the investigation and prosecution had begun); *see also* ECF No. 183-17. Plaintiffs thus admit that Ippolito is "not an original co-conspirator." ECF No. 182-1 ¶ 55; SAC ¶ 51 (admitting that Ippolito cannot directly "be linked to the original conspiracy"). Still, Plaintiffs claim that after Ippolito took office his personal involvement can be demonstrated because he "was the immediate supervisor to whom the courtroom Deputy Town Attorneys reported," and "he did not end the prosecution but adopted and continued it." ECF No. 182-1 ¶ 55; ECF No. 182-5 at 6, 10; SAC ¶¶ 52–54 (alleging Ippolito was "co-equally responsible" for the "prosecution's supervision and continuance"). But again, Plaintiffs can point to "no specific evidence" to establish the existence of a genuine dispute of material fact as to Ippolito's personal involvement. *Brown*, 654 F.3d at 358.

As noted above, Ippolito cannot be held liable simply because he supervised individuals who were involved with Mr. Thomas's state prosecution. *See Tangreti*, 983 F.3d at 618. Plaintiffs provide no facts to back up their claims that Ippolito actively participated in Mr.

26

Thomas's state case as anything other than a supervisor.  While Plaintiffs did mail Ippolito a letter asserting Mr. Thomas's innocence, ECF No. 182-1 ¶ 55, the parties agree that Ippolito never responded, and Plaintiffs can point to no evidence that he personally investigated the matter or acted upon the information in the letter.  *See Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (noting that even if an individual receives and reads a letter regarding a constitutional violation, that action does not constitute personal involvement unless he or she (i) looks into the matter personally, or (ii) otherwise acts on the information contained therein); *Malek v. N.Y. St. Unified Ct. Sys.*, No. 22-cv-5416, 2023 WL 2429528, at *13 (E.D.N.Y. Mar. 9, 2023) (dismissing Section 1983 claims because plaintiff's allegations that certain defendants ignored his inquiries about pending litigation and refused to exercise their supposed power to settle or dismiss that litigation did not amount to personal participation in alleged constitutional violations).  The Court therefore disagrees with Plaintiffs that "[Ippolito's] non-response is inferable as to his knowledge, approval, and after-the-fact joinder in the conspiracy to drive plaintiffs out of town."  SAC ¶ 58.

Accordingly, Plaintiffs' failure to adduce evidence of Genova's or Ippolito's personal involvement in the alleged equal protection violations requires granting summary judgment in favor of Genova and Ippolito on Plaintiffs' Section 1983 claim.  *Cruz*, 232 F. Supp. 3d at 452.

### E.   *Defendant Gioia's Immunity*

Defendants argue that Defendant Gioia has both absolute and qualified immunity, which protects him from Plaintiffs' Section 1983 claim.  ECF No. 183-44 at 11–15.  The Court agrees that Defendant Gioia has qualified immunity but not absolute immunity and therefore dismisses the Section 1983 claim against Gioia for that reason.

1.    Absolute Immunity

First, Defendants argue that Gioia is entitled to summary judgment on Plaintiffs' Section 1983 claim against him because he is entitled to absolute prosecutorial immunity.  ECF No. 183-44 at 11–12.

"Prosecutors are entitled to absolute immunity when they function as advocates for the state in circumstances intimately associated with the judicial phase of the criminal process." *Baron v. Lissade*, No. 19-cv-6256, 2021 WL 4407836, at *7 (E.D.N.Y. Sept. 27, 2021).  "When assessing whether claims are barred by absolute immunity, courts focus on the nature of the function performed rather than the identity of the actor who performed it."  *Id*.  "If an actor is performing a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused."  *Id*. However, "[i]nvestigative work done before any formal legal proceeding has begun . . . is only entitled to qualified immunity."  *Id.; see also Simon v. City of New York*, 727 F.3d 167, 172 (2d Cir. 2013) ("[P]rosecutors receive only qualified immunity when performing administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.").  Absolute immunity does not extend to functions that are typically performed by police officers or investigative agents.  *See, e.g.*, *Kalina v. Fletcher*, 522 U.S. 118, 129–30 (1997) (holding that a prosecutor was not entitled to prosecutorial immunity for a sworn affidavit filed in support of an application for an arrest warrant); *Malley v. Briggs*, 475 U.S. 335, 342–343 (1986) (finding that a police officer did not have absolute immunity for submitting a complaint and supporting affidavit to a court in order to obtain an arrest warrant); *Washington v. Napolitano*, 29 F.4th 93, 103–04 (2d Cir. 2022) (holding that "if a prosecutor acts as a complaining witness by testifying to the evidentiary basis for an

28

arrest warrant application, the only function that she performs in giving sworn testimony is that of a witness" and thus she is not entitled to absolute immunity).

"[W]here a prosecutor is sued under § 1983 for unconstitutional abuse of his discretion to initiate prosecutions, a court will begin by considering whether relevant statutes authorize prosecution for the charged conduct." *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004).  Here, Plaintiffs argue that Gioia is not entitled to absolute immunity because "the two ordinances, § 246-5.2 . . . and § 93-28 . . . *do not authorize <u>any</u>* prosecution and are non-criminal statutes (no punishment set forth)."  ECF No. 182-5 at 8 (emphasis in original).  However, this is demonstrably incorrect:  Oyster Bay Town Code § 246-14.1.2 authorizes enforcement of violations of § 246-5.2, with penalties for violations laid out in § 246-14.7; Oyster Bay Town Code § 93-5 authorizes enforcement of violations of § 93-28, with penalties for violations laid out in § 93-12.

However, Plaintiffs further argue that Gioia was functioning more as an investigator than as a prosecutor when investigating the Property and that as such he should not be entitled to absolute immunity.  ECF No. 182-5 at 9.  The parties agree that Gioia swore out a court information charging Mr. Thomas with violating sections of the Town Code.  ECF No. 182-1 ¶ 23.  They also agree that Gioia inspected Plaintiffs' Property, *id.* ¶¶ 11–14, and researched whether Plaintiffs were in violation of the Town Code, *id.* ¶¶ 16–20.  These facts are more akin to investigative work and other functions typically performed by police officers or agents than to the preparation for a judicial proceeding typically performed by prosecutors.  *Simon*, 727 F.3d at 172.  Accordingly, Defendant Gioia has not demonstrated that he is entitled to absolute prosecutorial immunity, as a matter of law.

29

2.      Qualified Immunity

Plaintiffs agree that Gioia functioned as more of an "investigator" rather than a prosecutor.  ECF No. 182-5 at 8.  As an investigator, Defendants argue, Gioia's actions are entitled to qualified immunity protection.  "[T]he doctrine of qualified immunity . . . protects government officials from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sanchez v. Nassau Cnty.*, No. 17-cv-7335, 2023 WL 2457855, at *22 (E.D.N.Y. Mar. 11, 2023); *see also Faghri v. Univ. of Conn.*, 621 F.3d 92, 96 (2d Cir. 2010) ("Under qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

"Courts assess qualified immunity through a two-part inquiry:  (1) whether the facts, viewed in the light most favorable to the plaintiff, show that a government official's conduct violated a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Sanchez*, 2023 WL 2457855, at *22.  "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Reyes v. Fischer*, 934 F.3d 97, 103 (2d Cir. 2019).  In applying the two-part inquiry to assess qualified immunity, courts in this Circuit look at:  "(1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).  In analyzing a claim of qualified immunity, "[t]he ultimate question" is "whether it was

30

objectively reasonable for an officer to believe that his conduct did not violate a clearly established right." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 652 (E.D.N.Y. 2017). "At the summary judgment stage, a claim may be dismissed on qualified immunity grounds only when a court finds that an official has met his or her burden of demonstrating that no rational jury could find these two prongs to be satisfied." *Sanchez*, 2023 WL 2457855, at *22. Courts have regularly found that building inspectors and code enforcement officers are entitled to qualified immunity. *See Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 238–40 (E.D.N.Y. 2014) (granting summary judgment for building inspector and code enforcement officer because they were entitled to qualified immunity); *see also Zahra v. Town of Southold*, 48 F.3d 674, 688 (2d Cir. 1995) (holding that building inspectors were entitled to the defense of qualified immunity because the court found their actions at the time objectively reasonable).

As discussed in Sections I.A.–I.C., *supra*, the specific constitutional rights that Plaintiffs allege that Gioia violated are: (1) Mr. Thomas's equal protection rights by engaging in selective enforcement and malicious prosecution; and (2) Plaintiffs' due process right to use the Property as a two-family home. However, the facts, viewed in the light most favorable to Plaintiffs, do not show that Gioia violated these rights. *See, e.g.*, *Gonzalez*, 728 F.3d at 154; *Sanchez*, 2023 WL 2457855, at *22. As an initial matter, Plaintiffs' due process claims are not yet ripe, and so are not properly before the Court. *See supra* Section I.C.; *see also Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, N.Y.*, 111 F. Supp. 3d 459, 493 (S.D.N.Y. 2015) (an official does not need to establish qualified immunity with respect to claims dismissed on ripeness grounds). With respect to Mr. Thomas's equal protection claims, the facts establish that it was objectively reasonable for Gioia to initiate an investigation into the Property and that his doing so and eventually bringing an enforcement action, did not violate Mr. Thomas's equal protection rights.

31

Gioia is entitled to "qualified immunity from a malicious prosecution claim if . . . it was objectively reasonable for [him] to believe that probable cause existed." *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013); *see also Fleurimond v. Holder*, 403 F. Supp. 3d 95, 106 (E.D.N.Y. 2019) (granting defendants summary judgment on plaintiffs' malicious prosecution claims after finding that defendants were entitled to qualified immunity because they had probable cause to prosecute plaintiff). Here, for the reasons stated in Section I.A., *supra*, the Court has found that Gioia had probable cause to initiate a code enforcement proceeding against Mr. Thomas. Accordingly, he is entitled to qualified immunity on Plaintiff's equal protection malicious prosecution claim.

Gioia is also entitled to qualified immunity on Mr. Thomas's equal protection selective enforcement claim. The Court has already found that Mr. Thomas cannot, as a matter of law, make out a violation of a constitutional right because Mr. Thomas can neither prove that he was treated differently from similarly situated individuals nor that his treatment was based on impermissible considerations related to his race. *See supra* Section I.B. Because Mr. Thomas cannot prove that he was treated differently from similarly situated individuals, he cannot show that it was unreasonable for Gioia to investigate and initiate a code enforcement proceeding against him or that by doing so, Gioia violated his equal protection rights. *See, e.g.*, *Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018) (holding that defendants were entitled to qualified immunity on a selective enforcement claim when it was reasonable for them to believe that they were not treating plaintiffs differently from other similarly situated individuals); *Capasso v. Metro. Transp. Auth.*, 198 F. Supp. 2d 452, 465 (S.D.N.Y. 2002) (finding that a defendant was entitled to qualified immunity at the summary judgment stage on plaintiff's selective enforcement claim because plaintiff failed to allege any conduct fairly attributable to the

32

defendant that would be violative of federal law).  Therefore, Gioia is entitled to qualified immunity with respect to Mr. Thomas's selective enforcement equal protection claim.

Plaintiffs further argue that Gioia is not entitled to qualified immunity because "[i]t is conclusively unreasonable to twist the law for the racist reason of chasing a non-white couple out of town."  ECF No. 182-5 at 11.  The Court agrees that, *if* Gioia had commenced the investigation due to racial animus, he would not be entitled to qualified immunity.  *See Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 471 (S.D.N.Y. 2002) ("A decision motivated by racial animus, despite any other contributing motivations, violate[s] clearly established law.").  However, as noted in Sections I.A. and I.B., *supra*, Plaintiffs have put forth no evidence to suggest that there was racial animus at play here, and have admitted that Gioia would not have been independently aware of Mr. Thomas's race until after the enforcement action had commenced.  ECF No. 182-1 ¶¶ 25–29.

The Court finds that no rational jury could find that Gioia's conduct violated Mr. Thomas's equal protection rights.  An inspector who comes upon a house with clear outward indicia of multi-family use—two meters, two doorbells, split cable lines, etc.—is in the right to conclude that an ordinance violation meriting further investigation and potential enforcement action is occurring.  ECF No. 182-1 ¶¶ 12–15.  Therefore, because no reasonable officer in Gioia's position could have believed that he was violating a clearly established constitutional right, Plaintiffs' claim against Gioia is barred by the doctrine of qualified immunity.

**II.      Intentional Discrimination (Sections 1981 & 1982)**

Plaintiffs also allege that the individual Defendants intentionally discriminated against them in violation of Sections 1981 and 1982.  "Section 1981 provides that all persons have [an] equal right to make and enforce contracts, and [Section] 1982 establishes that all persons have

33

[an] equal right to purchase, lease, sell, hold, and convey real and personal property." *Silva v. Farrish*, 47 F.4th 78, 89 (2d Cir. 2022). As an initial matter, the Second Circuit has concluded that "42 U.S.C. § 1983 provides the sole cause of action available against state actors alleged to have violated § 1981." *Smalls v. Collins*, 10 F.4th 117, 144 (2d Cir. 2021); *see also Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018) (holding that "§ 1981 does not provide a separate private right of action against state actors"). Accordingly, Plaintiffs' Section 1981 claim should be dismissed because it was not brought under Section 1983. However, even if the Court construes Plaintiffs' Section 1981 claim as brought under Section 1983, Defendants are entitled to summary judgment.

"To state a *prima facie* claim under either [Section 1981 or 1982], plaintiffs must prove: (1) they are members of a racial minority; (2) an intent to discriminate on the basis of their race by defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *Silva*, 47 F.4th at 90. "To survive summary judgment, the plaintiffs need[] to produce enough evidence for a reasonable jury to find that the defendants intentionally discriminated against the plaintiffs based on race." *Id*. Plaintiffs have failed to do so here.

Plaintiffs admit that there is no direct evidence that any of the individual Defendants acted intentionally to discriminate against Mr. Thomas on the basis of his race, ECF No. 182-1 ¶¶ 27–28, 39–40, but argue that the circumstantial evidence here "permits no other inference but racism." ECF No. 182-5 at 21. The Court disagrees. First, Plaintiffs have admitted that Gioia was unaware of Mr. Thomas's race or ethnicity when he made the decision to investigate the Property or prosecute Mr. Thomas. ECF No. 182-1 ¶¶ 25–29, SAC ¶ 60. Without knowledge of

34

Mr. Thomas's race, Gioia could not have initiated the prosecution with an intent to discriminate on the basis of race.

Plaintiffs also base their claim on the argument that the civilian complaint that led to the investigation against them is fraudulent. *See* n.4, *supra*. Specifically, Plaintiffs allege that the document is fraudulent because it was not time-date stamped in the lower right corner, *see* ECF No. 182-5 at 22, unlike the prior Request for Investigation that was filed against the Property's prior owner. *Compare* ECF No. 183-18 *with* ECF No 182-7 at 139. This is incorrect. While the stamp is faint, the Court can clearly make out the time-date stamp on the 2007 Request for Investigation. Plaintiffs provide no additional evidence or argument that would permit the Court to conclude that the 2007 Request for Investigation is fraudulent, and without specific facts to counter the authenticity of the document the Court does not consider its provenance in dispute. *See Patterson*, 375 F.3d at 219; *see also* Rule 56(e). And, even if there were no time stamp on the 2007 Request for Investigation, Plaintiffs do not explain why the lack of a time stamp would necessarily lead to the conclusion that the document is fraudulent.[17]

Plaintiffs instead allege that the investigation was initiated on the request of non-party Joseph Saladino, *see* ECF No. 182-5 at 22, who met the Plaintiffs after almost selling them a house he owned and was thus aware of Mr. Thomas's race. ECF No. 182-1 ¶ 27 (admitting that

---

[17] Plaintiffs also assert that the Request for Investigation has to be a fraudulent "later-drafted concoction" because Defendants redacted the civilian's identity on the copy of the document that they produced to Plaintiffs. The record belies Plaintiffs' claim. As Defendants point out in their motion, the record establishes that Defendants were willing to provide Plaintiffs with an unredacted copy of the Request for Investigation contingent on the parties coming to an agreement on a confidentiality agreement. ECF No. 183-44 at 11 n.3. Plaintiffs do not contest that assertion. That the parties were unable to reach a confidentiality agreement does not mean that the Request for Investigation is fraudulent or that anything is being concealed from Plaintiffs.

Gioia was not aware of Mr. Thomas's race, but alleging he was following orders from officials associated with the Town Republican Party, who had been "[t]ipped by Saladino"); SAC ¶ 62. Plaintiffs provide no specific facts to connect Gioia and Saladino.

Plaintiffs have already admitted that there is no evidence Genova and Ippolito were involved with the initial investigation of the Property or the decision to prosecute Mr. Thomas, and that they have no evidence that Genova or Ippolito (or Gioia) ever made any comment regarding Mr. Thomas's race or that the prosecution was racially motivated. ECF No. 182-1, ¶¶ 50–55, 39–40. Therefore, there is no evidence that any of the Defendants ever undertook any action with an intent to discriminate against Plaintiffs on the basis of race.

"Without evidence of racial animus, [Plaintiffs'] discrimination claims cannot survive summary judgment." *Silva*, 47 F.4th at 90. Accordingly, the Court grants Defendants summary judgment on Plaintiffs' Section 1981 and 1982 claims.

### III.     Conspiracy (Sections 1985 and 1986)

Plaintiffs allege that the individual Defendants committed a "racist conspiracy" and neglected to prevent a "racist conspiracy" in violation of Sections 1985 and 1986. SAC ¶ 134.

#### A.  Section 1985 Claim

"To establish a claim under section 1985, a plaintiff must show (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Guillen v. City of New York*, 625 F. Supp. 3d 139, 159 (S.D.N.Y. 2022).

Section 1985 "provides no substantive rights itself but merely provides a remedy for

violation of the rights it designates." *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F.

Supp. 3d 290, 297 (E.D.N.Y. 2018).  As previously noted, Plaintiffs have failed to produce any

evidence whatsoever, beyond conclusory statements "on information and belief," that the zoning

action against Mr. Thomas was initiated because of his race.  *See* Section I, *supra*; *see also Jean*

*v. Cnty. of Nassau*, No. 14-cv-1322, 2020 WL 1244786, at *14 (E.D.N.Y. Mar. 16, 2020)

(finding that "[b]ecause a claim under Section 1985(3) requires proof of discriminatory racial

animus" and plaintiff had "failed to produce any evidence whatsoever, beyond his conclusory

statement[s]," summary judgment for defendants was appropriate on Plaintiff's Section 1985

claim for the same reasons that it was appropriate on plaintiff's equal protection claim).

Therefore, because the Court finds that there is no underlying constitutional violation,

Defendants are entitled to summary judgment on Plaintiffs' Section 1985 claim.  *See Jean*, 2020

WL 1244786, at *14 (granting defendants summary judgment on plaintiff's Section 1985 claims

and stating that "as the Court has determined that [p]laintiff's constitutional rights have not been

violated, his Section 1985(3) conspiracy claims must be dismissed as well"); *Carson v. Lewis*, 35

F. Supp. 2d. 250, 271 (E.D.N.Y. 1999) (granting summary judgment on Plaintiff's Section 1985

conspiracy claim after finding that there was no constitutional violation).

Even if Plaintiffs' Section 1985 claim did not fail because Plaintiffs cannot establish an

underlying constitutional violation, it would nevertheless fail because Plaintiffs cannot establish

any specific facts to demonstrate that a meeting of the minds existed between or among the

individual Defendants.  *See Masters v. Mack*, No. 22-cv-6582, 2022 WL 17961211, at *6

(E.D.N.Y. Dec. 27, 2022) ("To assert a conspiracy under Section 1985, a plaintiff must [also]

provide some factual basis supporting a meeting of the minds, such that defendants entered into

an agreement, express or tacit, to achieve the unlawful end.")  "[S]peculative claims cannot

reasonably lead to the inference that the defendants positively or tacitly came to an agreement."

*Delee v. Hannigan*, 729 F. App'x 25, 32 (2d Cir. 2018).

Here, Plaintiffs' only argument in support of this essential element is that they can think of no other explanation for why Gioia, who they admit was not independently aware of Mr. Thomas's race, would investigate and prosecute Mr. Thomas.  ECF No. 182-1 ¶¶ 25–29. Plaintiffs speculate that Gioia must have been "ordered to" act against them by Genova and Ippolito.  ECF No. 182-5 at 24; *see also* ECF No. 182-1 ¶ 25 (arguing that Gioia was "used by his Oyster Bay bosses to rid the Town of the black-Hispanic couple").  However, Plaintiffs do not point to any evidence suggesting that any of the individual Defendants ever communicated with each other about Plaintiffs.[18]  More broadly, Plaintiffs argue that no direct evidence of this conspiracy is needed because Defendants' actions can only be explained by racism.  ECF No. 182-5 at 1; ECF No. 182-1. ¶¶ 1, 40.  These claims are speculative, at best, and cannot reasonably lead to the inference that the individual Defendants came to an illicit agreement. *Delee*, 729 F. App'x at 32; *see also Silas v. City of New York*, No. 18-cv-7122, 2023 WL 5532856, at *10 (E.D.N.Y. Aug. 28, 2023) ("Absent specific factual allegations as to the participation of a particular defendant in the conspiracy, plaintiff's 1985(3) claim cannot survive a motion for summary judgment by that defendant.").

The Court finds that Plaintiffs' conclusory allegations of conspiracy, without reference to any specific facts to support that a meeting of the minds existed between or among Defendants,

---

[18]     The Court also notes that Ippolito was not employed by the Town at the time the complaint against Mr. Thomas was filed, and Plaintiffs do not explain on what authority he could have ordered Gioia to take action.  SAC ¶ 51.

is insufficient to raise a genuine issue of material fact that a conspiracy existed.  Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' Section 1985 claim.

> ### B.   *Section 1986 Claim*

Plaintiffs also allege that Defendants violated their rights under Section 1986, "which proscribes knowingly failing to prevent a Section 1985 conspiracy which such person by reasonable diligence could have prevented."  *Jean-Baptiste v. Montway LLC*, No. 22-cv-5579, 2022 WL 11213581, at *2 (E.D.N.Y. Oct. 19, 2022).  "[A section] 1986 claim must be predicated on a valid [section] 1985 claim."  *See Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 2000).  "In the absence of a viable [section] 1985 claim, [a section] 1986 claim also fails."  *Brown v. Vitucci*, No. 22-cv-1070, 2023 WL 2961730, at *3 (2d Cir. Apr. 17, 2023).  Because the Court grants summary judgment in favor of Defendants on Plaintiffs' Section 1985 claim, Plaintiffs' Section 1986 claim cannot survive summary judgment.

Accordingly, the Court grants Defendants summary judgment on Plaintiffs' Section 1986 claim.

### IV.   *Monell* Liability

Plaintiffs also bring a claim for *Monell* liability against the Town.  "To succeed on a *Monell* claim, plaintiffs must demonstrate that a policy or custom of the [Town] caused a deprivation of their federal or constitutional rights."  *Nixon v. City of New York*, No. 19-cv-5032, 2023 WL 2799920, at *6 (E.D.N.Y. Apr. 6, 2023); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (holding that a local government can only be sued under Section 1983 when execution of a government's policy or custom causes injury).  The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the

deprivation of a constitutional right. *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020).

"It is well-settled that a *Monell* claim cannot succeed without an underlying constitutional violation." *Mastromonaco v. Cnty. of Westchester*, 779 F. App'x 49, 51 (2d Cir. 2019); *see also Oquendo v. City of New York*, 492 F. Supp. 3d 20, 32 (E.D.N.Y. 2020) (quoting *Mastromonaco*); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (finding that a district court does not need to address *Monell* liability if it finds no underlying constitutional violation). Applying these standards, the Court need not consider Plaintiffs' *Monell* claim on the merits. Because the Court concluded, *see supra* Section I, that Plaintiffs' Section 1983 equal protection and due process claims fail, it follows that there can be no municipal liability with respect to these claims. *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 658 (S.D.N.Y. 2021).

However, even considered on the merits, Plaintiffs' *Monell* claim also fails. "[M]unicipalities may not be held liable unless action pursuant to *official municipal policy* of some nature caused a constitutional tort." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id*.

Plaintiffs argue, and Defendants dispute, that "[t]he Town of Oyster Bay maintains a 'black exclusion' policy that is readily discernable from not just its officials' actions in this case, and the then declaration of its current supervisor, but through Census statistics and their actions in their housing programs." ECF No. 182-2 ¶ 61; ECF No. 182-5 at 25–26; ECF No. 182-1. ¶ 27 ("The Town Republican Party, holding every Town elected office, acted under private prejudices and through official policy to keep blacks out."). The Court finds that these conclusory

allegations without additional evidentiary or factual support are insufficient to establish that the Town has an official policy of excluding Black residents.

Plaintiffs concede that Gioia would not have independently known Mr. Thomas's race when he investigated the Property and initiated the prosecution, so his actions cannot be seen as evidence of a "policy of Black exclusion." ECF No. 182-1 ¶¶ 27–29; SAC ¶ 60. The Court has already found that Plaintiffs have not adduced sufficient facts to suggest a conspiracy between Gioia, Ippolito, and Genova, and that there is no evidence that Ippolito or Genova, or any other Town employee for that matter, undertook any personal or official action related to Mr. Thomas's investigation or prosecution.[19] To show that *inaction* by a policymaker demonstrates municipal liability sufficient to defeat summary judgment, Plaintiffs would have to provide specific facts showing that supervising employees that worked for the Town, such as Genova and Ippolito, "persistent[ly] fail[ed] to discipline subordinates who violate[d] civil rights." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020) (noting an official's failure to discipline can "give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*"). Plaintiffs have not alleged that Genova, Ippolito, or any other Town employee failed sufficiently to discipline subordinates, let alone provided specific facts demonstrating such failure.

Plaintiffs claim to have heard non-party Saladino, the current Town Supervisor, "blurt[] out that if he sold his house to a black man *his political career would be over*" in 2006. SAC ¶ 62 (emphasis in original). However, Saladino was a New York State Assemblyman at the time

---

[19]      Plaintiffs also offer no evidence that either Ippolito or Genova would have known about Mr. Thomas's race other than speculation about a conversation with Saladino, the existence of which Plaintiffs have offered no evidence or testimony to support. ECF No. 182-1 ¶ 27.

of this alleged statement—he did not become the Town Supervisor until 2017.[20]  Thus,

Saladino's 2006 statement cannot be viewed as an expression of any official Town policy.

Plaintiffs further argue that the existence of an unrelated pending FHA action brought by

the federal government against the Town, shows the existence of the Town's "Black exclusion

policy."  ECF No. 182-5 at 25–26.  That case, *United States v. Town of Oyster Bay,* alleges that

the Town incorporated racial residency preferences into two of its low-income housing

programs.  *See United States v. Town of Oyster Bay*, No. 14-cv-2317, 2022 WL 4485154, at *1

(E.D.N.Y. Sept. 27, 2022).  Plaintiffs do not allege they were ever involved with either of the

programs covered by the suit.  In addition, that case is still pending, and the court has not yet

made any findings of fact that would support Plaintiffs' claim that a wider policy exists.

Finally, Plaintiffs attempt to demonstrate that a "Black exclusion policy" exists by

providing general statistics regarding the demographics of the Town.  ECF No. 182-5 at 25–26.

These statistics alone are insufficient to establish that an official Town policy exists.  *See*

*Fantozzi v. City of New York*, No. 21-cv-4439, 2023 WL 4472305, at *6 (S.D.N.Y. July 11,

2023) (noting that general statistics are insufficient to demonstrate an official policy for a *Monell*

claim without a specific causal link to plaintiff's underlying constitutional violation).  Plaintiffs

have failed to demonstrate any specific causal link between those statistics and their alleged

selective prosecution claim.

Plaintiffs have failed to allege any underlying constitutional violation or raise any

---

[20]     *See* Supervisor Joseph S. Saladino, Town of Oyster Bay, available at
https://perma.cc/MF6F-87R6 (last visited September 29, 2023) ("On January 31, 2017, Joseph
Saladino was sworn into office as the 70th Town of Oyster Bay Supervisor… Prior to serving as
Town Supervisor, Joseph Saladino served residents in the New York State Assembly for six
terms.").

genuine issue of material fact which would permit the Court to infer that Mr. Thomas's

prosecution was connected to any underlying municipal policy.  Accordingly, the Court grants

the Town summary judgment on Plaintiffs' *Monell* claim.

   **V.        Fair Housing Act**

   Defendants do not address Plaintiffs' FHA claim in any detail.  Instead, Defendants

contend that Plaintiffs should not be allowed to pursue their Section 1986, FHA, or Due Process

claims because Plaintiffs' addition of those claims directly violates Judge Seybert's 2013 Order,

which permitted Plaintiffs "to file an amended complaint that pleads/repleads the following

claims only:  (i) their selective enforcement claims against Gioia, Venditto, Genova, and Ippolito

in their individual capacities; (ii) their *Monell* claim against the Town arising out of the

purported equal protection violation; and (iii) their state common law claims against all

Defendants."  ECF No. 183-44 at 3; *see also* ECF No. 70 at 33.  This is an accurate recounting of

the 2013 Order.  ECF No. 70.  Plaintiffs make no effort to address the 2013 Order or the

propriety of amending to add an FHA claim in their summary judgment papers.  ECF No. 182.

Although as discussed, the judge previously presiding over this case (Judge Azrack) allowed

Plaintiffs to file the SAC, the order permitting the filing did not specifically reference Plaintiffs'

newly added FHA claim.  *See* ECF Text Order, September 27, 2021.  Upon further review, it is

clear that the Court at the time of the filing of the SAC did not appreciate the extent to which

Plaintiffs' addition of the FHA claim conflicted with Judge Seybert's prior ruling limiting the

scope of any amendment.  *Id.*  In light of this, the Court now finds that Plaintiffs were not

permitted, pursuant to Judge Seybert's 2013 Order, *see* ECF No. 70, to amend their complaint to

include the FHA claim.  To allow Plaintiffs to add a new claim so distinct from the Title 42

claims otherwise proffered in the SAC almost ten years after the complaint was originally filed

and well after the close of discovery on November 20, 2012, would be unduly prejudicial to Defendants. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). The Court therefore dismisses Plaintiffs' FHA claim on that basis.

### A. The District Court's Power to Grant Summary Judgment Sua Sponte

However, even if Plaintiffs had been permitted to amend their complaint to include their FHA claim, that claim would fail on the merits. Although Defendants do raise the impropriety of Plaintiffs' FHA claim in their motion for summary judgment, they do not explicitly ask the Court to grant them summary judgment on that claim because they relied only on the procedural argument related to the scope of amendment. ECF No. 183-44 at 3.

Under Rule 56(f) of the Federal Rules of Civil Procedure, the Court can grant summary judgment on grounds not raised by either party in a motion after giving notice and a reasonable time to respond. Fed. R. Civ. P. 56(f). Interpreting Rule 56(f), the Second Circuit has held that "district courts have the discretion to grant summary judgment *sua sponte*, even without notice in certain circumstances." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011); *see also Jian Yan Lin v. Shanghai City Corp.*, 950 F.3d 46, 49 (2d Cir. 2020) (same).

In granting summary judgment *sua sponte*, the Court "must determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *Priestley*, 647 F.3d at 504*; see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that it had to come forward with all of its evidence."); *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996) ("Where it appears clearly upon the record that all the evidentiary materials that a party might submit in response to a motion for summary judgment are before the

44

court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.").   "Before granting summary judgment *sua sponte*, the district court must assure itself that following the procedures set out in Rule 56 would not alter the outcome.  Discovery must either have been completed, or it must be clear that further discovery would be of no benefit." *Ramsey*, 94 F.3d at 74.  Any threat of procedural prejudice posed by the granting *sua sponte of* summary judgment on a claim is "greatly diminished if the court's *sua sponte* determination is based on issues identical to those raised by the moving party." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000).

Here, it is appropriate to *sua sponte* determine whether Defendants are entitled to summary judgment on Plaintiffs' FHA claim because the facts before the Court are fully developed such that Plaintiffs suffer no procedural prejudice.  *Id*. at 139.  As an initial matter, Plaintiffs were on notice as to potential defects in their FHA claim, but failed to respond to Defendants' argument or address their FHA claim at all in their papers.  ECF No. 182. Discovery in this case closed on November 20, 2012, and remained closed despite multiple efforts by Plaintiffs to reopen discovery.  *See, e.g.*, ECF No. 88 (Minute Entry re close of discovery); ECF No. 97 (Minute Entry denying Plaintiffs' motion to reopen discovery); ECF Text Order, September 27, 2021 (Order denying Plaintiffs' application to reopen discovery); *see also Celotex*, 477 U.S. at 326.  On March 22, 2022, Defendants served Plaintiffs with a copy of their motion for summary judgment.  ECF No. 183-44.  Defendants' motion was broad, covered all of Plaintiffs' other claims, and attached more than 30 supporting exhibits.  ECF No. 183. Plaintiffs' opposition was similarly broad and attached more than 500 pages of materials to support their argument that summary judgment should not be granted.  ECF No. 182.

To establish a FHA claim, a plaintiff must show that defendants acted with a "discriminatory motive." *Brown v. Fire Dep't of City of New York*, No. 19-cv-2400, 2020 WL 6940992, at *4 (E.D.N.Y. Nov. 25, 2020). Discrimination on the basis of Mr. Thomas's race is an element that underpins Plaintiffs' other claims against the individual Defendants, including Plaintiffs Section 1981, 1982, and 1983 claims. Accordingly, the issues relevant to Plaintiffs' FHA claim, *i.e.*, whether the individual Defendants acted with discriminatory motive, are largely identical to issues relevant to Defendants' arguments as to Plaintiffs' other claims, and all the evidentiary materials that Plaintiffs might have submitted to support their FHA claim should have already been brought before the Court in support of Plaintiffs' opposition to Defendants' motion for summary judgment. *See Ramsey*, 94 F.3d at 74; *Bridgeway*, 201 F.3d at 140. Plaintiffs have had a "full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried" with respect to its FHA claim. *Benny v. City of Long Beach*, No. 20-cv-1908, 2022 WL 2967810, at *19 (E.D.N.Y. July 27, 2022). Therefore, if the Court determines that the materials before it show that no material dispute of fact exists as to Plaintiffs' FHA claim, it can *sua sponte* grant Defendants summary judgment.

B.      FHA Claim

Plaintiffs allege that Defendants attempted to deprive them of their right to live at the Property in violation of Sections 3604(a), 3604(b), and 3617 of the FHA. Section 3604 prohibits private actors from engaging in certain discriminatory actions against individuals seeking housing. Specifically, Section 3604(a) makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race." 42 U.S.C. § 3604(a). Section 3604(b) makes it unlawful to "discriminate against any person in the terms, conditions, or

46

privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race."  42 U.S.C. § 3604(b).  Furthermore, Section 3617 of the FHA makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed  .  .  .  any right granted or protected by," in relevant part, 42 U.S.C. § 3604.  42 U.S.C. § 3617.

Plaintiffs do not clearly articulate how their rights under the FHA have been infringed. From the SAC and Plaintiffs' motion papers, Plaintiffs appear to allege that the individual Defendants attempted to interfere with their ability to enjoy the privileges of the Property on account of Mr. Thomas's race.  Specifically, Plaintiffs allege that the individual Defendants acted to drive Plaintiffs from their home because Mr. Thomas was Black after non-party Saladino allegedly tipped off Defendants about Mr. Thomas's race.  SAC ¶¶ 37–54.  FHA claims can proceed either "on a theory of intentional discrimination, *i.e.* disparate treatment, or on a theory of disparate impact."  *Reed v. Friedman Mgmt. Corp.*, No. 11-cv-7547, 2019 WL 1409726, at *3 (S.D.N.Y. Mar. 28, 2019).  Plaintiffs appear to be proceeding on the theory of disparate treatment based on allegations that the individual Defendants "acted  .  .  .  to drive plaintiffs from their home."  SAC ¶ 137; *see also* ECF No. 182-1 ¶ 25 (arguing that Gioia was "used by his Oyster Bay bosses to rid the Town of the black-Hispanic couple").

 "FHA disparate treatment claims are analyzed under the *McDonnell Douglas* burden-shifting framework used to evaluate Title VII employment discrimination claims."  *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 585–86 (S.D.N.Y. 2012).  Under this framework, "[first Plaintiffs] must establish a *prima facie* case of discrimination.  Then, the burden shifts to the defendants to produce a legitimate, non-discriminatory reason for their actions.  If the defendants make such a showing, the burden shifts back to the plaintiff to demonstrate that defendants'

proffered reason is pretextual, and that discrimination was the real reason for the defendants'

actions." *Id.*

"Because §§ 3604 and 3617 prohibit a wide range of conduct, courts in this Circuit have

articulated the elements of a *prima facie* showing in differing ways depending on the conduct at

issue. But regardless of how the *prima facie* standard is articulated, [Plaintiffs are] required to

show that defendants' action against [them] arose from a discriminatory motive." *Haber*, 847 F.

Supp. 2d at 586. "In proving a *prima facie* case of housing discrimination," Plaintiffs must

prove that "the defendant's challenged actions were motivated by discrimination." *273 Lee Ave.*

*Tenants Ass'n by Sanchez v. Steinmetz*, 330 F. Supp. 3d 778, 793 (E.D.N.Y. 2018). "Without

some evidence of the defendant's knowledge of [Plaintiffs'] racial identity, it is impossible to

infer such motivation." *Id.* Accordingly, "[s]ummary judgment is appropriate if no reasonable

jury could find that defendant's actions were motivated by discrimination." *Mitchell v. Shane*,

350 F.3d 39, 47 (2d Cir. 2003).

Plaintiffs cannot establish a *prima facie* case of discrimination. Plaintiffs admit that

Gioia would not have known Mr. Thomas's race at the time he initiated the code enforcement

proceeding against him, and point to no specific facts to rebut Defendants' sworn assertions that

they did not know Mr. Thomas's race. ECF No. 182-1 ¶¶ 27–29; ECF No. 183-4 ¶¶ 8–14;

(Genova Affidavit); ECF No. 183-5 ¶ 48 (Gioia Affidavit). Plaintiffs stated during their

depositions that they believed the code enforcement action was filed against them because of

their race but were unable to point to any evidence to support this belief, including any

conversations they participated in or heard about. ECF No. 182-1 ¶¶ 39–40; ECF No. 183-11

(Marlene Thomas Deposition); ECF No. 183-14 (Darren Thomas Deposition). And, although

Plaintiffs allege that they were treated differently from their white neighbors, Plaintiffs have

48

admitted that they do not know the race or ethnicity of the owners of other homes in their neighborhood.  ECF No. 182-1 ¶¶ 41–42; ECF No. 182-5 at 20.  Plaintiffs had every opportunity to depose the individual Defendants and press them on their motivations but chose not to depose either Ippolito or Genova.  ECF No. 182-1 ¶ 50.  When Plaintiffs deposed Gioia, they did not elicit information sufficient to establish discriminatory intent on his part.  ECF No. 182-8 at 296-364.  Plaintiffs' conclusory assertions of discrimination lack any factual or evidentiary underpinnings and are "insufficient for a rational jury to find discriminatory intent" in the light of the entire record.  *Sanchez v. Thompson*, No. 07-cv-0531, 2011 WL 890763, at *9 (E.D.N.Y. Mar. 11, 2011).  Accordingly, summary judgment in Defendants' favor on Plaintiffs' FHA claim is warranted.

**VI.     State Claims**

Defendants argue that if the Court grants summary judgment on Plaintiffs' federal claims, it should then decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. ECF No. 183-44 at 23.  "District courts may use their discretion in deciding whether to exercise supplemental jurisdiction over state law claims after dismissing a plaintiff's only federal claims, so long as the federal claims were not dismissed for lack of subject matter jurisdiction." *Probiv v. PayCargo LLC*, No. 22-cv-2907, 2023 WL 159788, at *5 (E.D.N.Y. Jan. 11, 2023); 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Cangemi v. United States*, 13 F.4th 115, 134 (2d Cir. 2021).  Having dismissed all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

**VII.   Plaintiffs' Cross-Motions**

Plaintiffs filed a notice of motion to disqualify Defendants' attorney and to permit Plaintiffs to amend their complaint.  ECF No. 182-4.[21]  Because the Court has dismissed or granted Defendants summary judgment on all of Plaintiffs' federal claims and declined to exercise supplemental jurisdiction over the state law claims, the Court dismisses Plaintiffs' motion to disqualify Defendants' attorney as moot.

To the extent Plaintiffs' motion to amend is not mooted by this Court's rulings on summary judgment, Plaintiffs' motion is denied.  Leave to amend may be properly denied for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008).  As an initial matter, Plaintiffs have failed to specify how amendment would cure any pleading deficiencies in its complaint. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505–06 (2d Cir. 2014).  Accordingly, Plaintiffs' motion to amend is denied.

Additionally, Plaintiffs' motion to amend should be denied because Plaintiffs have been granted two separate opportunities to amend their complaint but have repeatedly failed to cure any deficiencies. *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 296 (2d Cir. 2021) (denying a motion to amend when Plaintiff had "ample opportunity to amend its complaint").  Finally, discovery in this case ended more than ten years

---

[21]      Plaintiffs did not file a memorandum of law in support of their cross-motion.  Plaintiffs did file two letters supplementing their motion to disqualify Defendants' counsel. *See* ECF Nos. 189, 191.

SPA-51

ago, Plaintiffs' SAC was filed more than a year and a half ago, and the parties have fully briefed summary judgment motions on which the Court now rules.  Amendment at this point would unduly delay adjudication of this action and cause undue prejudice to Defendants.  *See, e.g., Bonano v. Staniszewski*, No. 12-cv-5879, 2015 WL 13840883, at *2 (E.D.N.Y. June 22, 2015) (denying plaintiff's motion to amend on the grounds of undue delay and prejudice when plaintiff moved to amend after discovery had closed and defendants had filed their summary judgment papers); *McCarthy*, 482 F.3d at 202 (denying a motion to amend when discovery had closed, defendants had filed for summary  judgment, and nearly two years had passed since the filing of the original complaint); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (upholding the denial of a motion to amend when discovery had already been completed and defendant had already filed a motion for summary judgment).  Accordingly, Plaintiffs' motion to amend is denied.

## CONCLUSION

For the reasons set forth above, the Court DISMISSES Plaintiffs' due process claim, which is not ripe for adjudication, GRANTS Defendants' motion for summary judgment and dismisses all of Plaintiffs' federal claims, declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and DISMISSES those claims, and DENIES Plaintiffs' motions to disqualify Defendants' attorney and to amend their complaint.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated:  Brooklyn, New York
        September 29, 2023

51